NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JAMES KEVIN COLEMAN (aka JAMES KEVIN ALMUDARRIS), <br><br> Appellant, <br><br> v. <br><br> STATE OF ALASKA, <br><br> Appellee. | Court of Appeals No. A-11909 <br> Trial Court No. 3AN-12-6523 CR <br><br> O P I N I O N <br><br> No. 2571 — October 13, 2017 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Stephanie E. Joannides, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. A. James Klugman, Assistant District Attorney, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge ALLARD.

---

[*]    Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

James Kevin Coleman[1] was convicted, following a jury trial, of second-degree burglary, second-degree theft, and fifth-degree criminal mischief based on allegations that he broke into a storage shed used by a commercial bike shop and stole two bicycles.[2] Coleman was also convicted of making a false report.[3]

On appeal, Coleman challenges his conviction for burglary, arguing that the bicycle storage shed was too small to qualify as a "building" for purposes of the burglary statutes. Coleman further contends that there was insufficient evidence that he was the person who broke into the shed and stole the bicycles, and that the trial court erred in denying his motion for a new trial based on the weight of the evidence. Coleman also challenges his conviction for making a false report, arguing that his false statement to the police did not qualify as a false "report" of a crime under AS 11.56.800(a)(2).

For the reasons explained in this opinion, we conclude that the bicycle storage shed qualified as a "building" as that term is defined in the burglary statutes. We also conclude that the evidence supporting Coleman's burglary, theft, and criminal mischief convictions was legally sufficient, and that the trial court did not err in denying Coleman's motion for a new trial. However, we conclude that there was insufficient evidence to convict Coleman of making a false report, given the nature of his false statement to the police and the circumstances under which that statement was made.

---

[1] The appellant's legal name appears to be James Kevin Almudarris, and this is reflected in the judgment. However, his birth name appears to be James Kevin Coleman, and he was referred to as "James Kevin Coleman" at trial. For the sake of consistency, we will refer to the appellant as "Coleman."

[2] AS 11.46.310(a); AS 11.46.130(a)(1); and former AS 11.46.486(a)(2) (2012), respectively.

[3] AS 11.56.800(a)(2).

Accordingly, we affirm Coleman's convictions for second-degree burglary, second-degree theft, and fifth-degree criminal mischief, and we reverse his conviction for making a false report.

*Why we conclude that the bicycle storage shed was large enough to qualify as a "building" for purposes of Alaska's burglary statute*

Under AS 11.46.310(a), a person commits burglary if the person "enters or remains unlawfully in a building with the intent to commit a crime in the building." Alaska Statute 11.81.900(b)(5) defines "building," in pertinent part, as follows:

> "building," in addition to its usual meaning, includes any propelled vehicle or structure adapted for overnight accommodation of persons or for carrying on business[.]

In the current case, Coleman was convicted of second-degree burglary for breaking into a shed that was used to store bicycles for a business. The shed was a permanent wooden structure with four walls, a floor, and a roof; it contained multiple enclosed storage lockers, secured by individual padlocks. Although the record does not reveal the exact dimensions of the shed, the evidence presented at trial indicated that the shed was approximately chest- to shoulder-high, and the shed could contain 20 to 25 bicycles. To enter the shed to retrieve the bicycles, an average-sized person would need to stoop.

At trial, the general manager of the bicycle shop testified that the shed was used to store bicycles that were brought in for repairs. On an average summer work day, 5 to 6 employees would access the shed to retrieve or store bicycles. The manager testified that employees would typically not need to fully enter the shed to retrieve the bicycles, but that they would sometimes have to crawl all the way into the shed if they were having difficulty getting a bicycle out. The entrance to each storage locker in the shed was kept secured with a padlock and equipped with a break-in alarm.

On appeal, Coleman argues that the shed did not qualify as a "building" for purposes of the burglary statute. Coleman contends that, because the crime of burglary was originally intended to protect dwellings, a structure can only qualify as a "building" for purposes of the burglary statute if it is either designed for human habitation or large enough to "comfortably accommodate people moving around" in it. According to Coleman, because the shed was made to accommodate bicycles and not people, and because an average-sized person would need to stoop to enter the shed, the shed did not qualify as a "building," and his conviction for second-degree burglary must be reversed.

In response, the State argues that the bicycle storage shed was a building both in the "usual meaning" of the word and because the shed was a structure that had been "adapted" for carrying on the bicycle shop's business — specifically, the storing and repairing of bicycles. The State concedes, however, that "at some point, a storage unit [may be] so small that it could not reasonably be considered 'a structure,'" and as such, would not be "a building."

The issue presented here is, therefore, how large a structure must be in order to be considered a "building" for purposes of the burglary statute. Because the statute is ambiguous on this point, we look to the purpose of the legislation and the legislative history for indications of legislative intent.[4]

The definition of "building" codified in AS 11.81.900(b)(5) is derived from Oregon law.[5] Both Alaska and Oregon define "building" broadly, and the two statutory definitions of "building" are essentially the same. As already set out, the Alaska statute defines "building" to include "its usual meaning" as well as "any propelled vehicle or

---

[4]    *See Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003).

[5]    *See Timothy v. State*, 90 P.3d 177, 178 (Alaska App. 2004); *Austin v. State*, 883 P.2d 992, 993 (Alaska App. 1994).

structure adapted for overnight accommodation of persons or for carrying on business."[6] Likewise, under the Oregon statute, "building" is defined "in addition to its ordinary meaning" as also including "any booth, vehicle, boat, aircraft or other structure adapted for overnight accommodation of persons or for carrying on business therein."[7]

The legislative history of these statutory definitions indicates that the Alaska and the Oregon legislatures intended these definitions to be expansive. The commentary to the tentative draft of Alaska's 1978 criminal code revision states that the definition is intended to be "broad enough to include house trailers, mobile field offices, house boats, vessels and even tents used as dwellings."[8] The commentary to the Oregon Criminal Code likewise explains that the definition of "building" was expanded from the "ordinary meaning of the word" so as to also include "those structures and vehicles which typically contain human beings for extended periods of time, in accordance with the original and basic rationale of the crime [of burglary]: protection against invasion of premises likely to terrorize occupants."[9]

Coleman relies heavily on the Oregon commentary for his claim that the Oregon and Alaska legislatures intended to limit the definition of "building" to *only* those vehicles or structures that "typically contain human beings for extended periods of time." But neither the plain language of the statute nor the legislative history support this claim.

---

[6]   AS 11.81.900(b)(5).

[7]   Or. Rev. Stat. § 164.205(1).

[8]   *See* Alaska Criminal Code Revision, Tentative Draft, Part III, at 51 (1977) ("Offenses Against Property").

[9]   *See State v. Scott*, 590 P.2d 743, 744 (Or. App. 1979) (quoting Commentary, Proposed Oregon Criminal Code (1970), § 135 at 143).

At common law, the crime of burglary required proof that the defendant unlawfully entered a human habitation. Burglary was defined as the breaking and entering of a dwelling at night with the intent to commit a crime therein.[10] The common-law offense of burglary was therefore strictly an offense aimed at protecting the security of habitation rather than property.[11]

But statutory enactments over the past 60 years have changed and expanded the common-law definition of the offense. For most jurisdictions, the requirement that the crime take place at night or that it be directed at a dwelling have disappeared.[12] Instead, most states (including Alaska and Oregon) now define burglary simply as unlawfully entering or remaining in a "building" with the intent to commit a crime therein.[13] The offense is elevated to a higher degree of burglary with increased punishment if the "building" is a "dwelling" or if the defendant's conduct poses a particular danger to people found within the building.[14]

---

[10]   *See* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3d ed. 1982) at 246, 255-56.

[11]   *Id*. at 255-56.

[12]   *See, e.g.*, Alaska Criminal Code Revision, Tentative Draft, Part III, at 55 (1977) ("Offenses Against Property") ("The traditional definition of burglary has been gradually expanded over the years to include acts which would not have been burglary in the common law sense.").

[13]   *See* AS 11.46.310(a); Or. Rev. Stat. § 164.215; *see also* former AS 11.20.100 (1970) (differentiating between "burglary of dwelling house" and "burglary not in dwelling house" and defining the latter as including "a building or part of it, or a booth, tent, railway car, vessel, boat, or other structure or erection *in which property is kept*") (emphasis added).

[14]   *See* AS 11.46.300(a)(2) (elevating second-degree burglary to first-degree burglary if the building is a dwelling, if the person is armed with a firearm, if the person causes or attempts to cause physical injury, or the person uses or threatens to use a dangerous

(continued...)

This transformation is evident in the relevant Oregon caselaw, which has upheld burglary convictions involving storage sheds and storage containers, even though they were designed to accommodate property, not people.[15] For example, in *State v. Essig,* the Oregon Court of Appeals held that a large potato storage shed qualified as a building under the burglary statute, describing it as a substantial structure and thus a building within the ordinary meaning of the term.[16] Similarly, in *State v. Handley*, the Oregon Court of Appeals held that a storage locker in an apartment complex's carport qualified as a building.[17] In *State v. Barker*, the court held that "self-contained storage units" within a commercial storage facility qualified as "buildings,"[18] and in *State v. Webb*, the court held that a tractor trailer adapted by a business to store goods likewise qualified as a "building."[19]

Coleman points out that these Oregon cases all involve storage containers or sheds that are considerably larger than the bicycle storage shed involved in his case. For example, the potato shed in *Essig* was large enough to "contain several trucks."[20] Likewise, the tractor trailer in *Webb* was twenty-five feet long and eight to nine feet wide

---

[14] (...continued)
instrument).

[15] *See, e.g.*, *State v. Webb*, 324 P.3d 522, 525 (Or. App. 2014); *State v. Handley*, 843 P.2d 456, 456-57 (Or. App. 1992); *State v. Barker*, 739 P.2d 1045, 1046-47 (Or. App. 1987); *State v. Essig*, 571 P.2d 170, 171 (Or. App. 1977).

[16] *Essig*, 571 P.2d at 171.

[17] *Handley*, 843 P.2d at 456-57.

[18] *Barker*, 739 P.2d at 1046-47.

[19] *Webb*, 324 P.3d at 524.

[20] *Essig*, 571 P.2d at 171.

(although no height was listed).[21]  But not all of the Oregon cases involve such large storage structures.  The storage lockers in *Handley* were only four feet wide, nine feet long, and seven feet high.[22]  And the dimensions of the storage unit in *Barker* were essentially unknown, although the court noted that it was "large enough for a human being to enter and move about."[23]

Coleman also relies on *State v. Scott*,[24] a 1979 Oregon Court of Appeals case in which the court reversed a conviction for burglary of a railway boxcar because it concluded that the boxcar did not qualify as a "building" for purposes of Oregon's burglary statute.  In *Scott*, the court quoted the legislative commentary to Oregon's burglary statute, noting that the expanded definition of "building" under the statute was still intended to comport with "the original and basic rationale for the protection against invasion of premises likely to terrorize occupants."[25]  The court therefore concluded that the railway boxcar did not fit the expanded definition because there was no evidence presented at trial that the boxcar had been adapted "for carrying on business therein" or "for accommodating people overnight" and there was nothing to indicate that the boxcar was anything other than "a structure on wheels designed for the storage of goods during their transportation."[26]

---

[21]  *Webb*, 324 P.3d at 524.

[22]  *Handley*, 843 P.2d at 456.

[23]  *Barker*, 739 P.2d at 1047.

[24]  590 P.2d 743 (Or. App. 1979).

[25]  *Id.* at 744 (quoting Commentary, Proposed Oregon Criminal Code (1970), § 135 at 143).

[26]  *Id.*

We conclude that Coleman's reliance on *Scott* is misplaced. Subsequent Oregon Court of Appeals cases have narrowed *Scott* to its facts, explaining that *Scott* involved a movable structure on wheels akin to a vehicle, rather than a stationary structure that could fit into the ordinary meaning of the term "building."[27] The reasoning of *Scott* has also been criticized. In *Barker*, for example, the Oregon Court of Appeals rejected the premise that a court must examine the primary uses of the storage units at issue "to determine whether an unauthorized entry would be likely to terrorize any human occupants."[28] Instead, the court looked to the "ordinary meaning" of the term "building," as evidenced by various dictionary definitions of the term — ultimately concluding that the storage units at issue qualified as "buildings" in the "ordinary sense of the word" because they were part of a "roofed and walled structure constructed for permanent use."[29]

Like the storage units in *Barker*, the storage shed at issue in Coleman's case appears to fit within the dictionary meaning of the term "building." Black's Law Dictionary defines the word "building" as:

> [A] structure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like. A structure or edifice inclosing a space within its walls, and usually, but not necessarily, covered with a roof.[30]

---

[27] *See, e.g., Barker*, 739 P.2d at 1046-47; *Webb*, 324 P.3d at 524.

[28] *Barker*, 739 P.2d at 1046.

[29] *Id*. at 1046-47.

[30] *Black's Law Dictionary* 176 (5th ed. 1979); *see also Austin v. State*, 883 P.2d 992, 993 (Alaska App. 1994) (citing to this definition and concluding that a freezer was "a building").

Here, the storage shed was a permanent structure with four walls, a roof, a floor, and a fixed entry place through which a person could enter the structure in order to store or retrieve the bicycles placed there by the business.

Coleman contends that, despite these attributes, the storage shed does not qualify as a "building" because the entrance was not high enough for an average-sized person to enter without stooping and it was not big enough for an average-sized person to move around "comfortably."

We agree with Coleman that, as a general matter, a structure that is too small for a human being to physically enter and occupy with their whole body cannot be considered a "building" that can be burglarized. We note that courts in other jurisdictions have reached a similar conclusion with regard to their burglary statutes.[31]

For example, in *Paugh v. State*, the Wyoming Supreme Court held that a three-foot display case in a department store was not a "separately secured or occupied portion" of a building for purposes of Wyoming's burglary statute because the display case was "too small to accommodate a human being."[32] The Washington Court of Appeals similarly held that a police evidence locker that was 10 inches high, 10 inches

---

[31] *See, e.g.*, *State v. Miller*, 954 P.2d 925, 930 (Wash. App. 1998) (noting that "burglary is ordinarily considered only in the context of a structure large enough to accommodate a human being"); *State v. Deitchler*, 876 P.2d 970, 972, n.6 (Wash. App. 1994) (noting that a structure too small for a human being to live in or do business in is not a 'building' or 'structure' for purpose of Washington's burglary statute); *Paugh v. State*, 9 P.3d 973, 981 (Wyo. 2000) (noting that the Wyoming burglary statute was designed primarily to protect places where people sleep and also places that a person could occupy). *Cf.* Iowa Code § 702.12 (defining "occupied structure" for purposes of Iowa's burglary statute as including structures where goods are stored and people are not present but excluding boxes, safes, or other objects which are "too small or not designed to allow a person to physically enter or occupy it").

[32] *Paugh*, 9 P.3d at 981.

wide, and 2 feet deep was too small to qualify as a "building" under Washington's burglary statute.[33] Coin boxes at a car wash have likewise been found to be too small to qualify as a "building,"[34] as have soft drink vending machines,[35] and a large tool box on wheels.[36]

But these cases all involve containers that are significantly smaller than the storage shed at issue in Coleman's case. Here, the trial testimony indicated that the bicycle shop's storage shed was designed to be wide enough, long enough, and tall enough — approximately chest- to shoulder-high — to allow an average-sized person to enter the shed and move about, albeit not necessarily for an extended period of time and not necessarily entirely comfortably. Indeed, the testimony at trial established that human beings did, at times, fully enter the shed to retrieve the bicycles stored inside.

Given these circumstances, and given that the shed otherwise exhibited all of the attributes associated with the term "building" in the usual meaning of the term, we conclude that the storage shed at issue here qualified as a "building" for purposes of Alaska's second-degree burglary statute. We therefore reject Coleman's claim that the evidence was insufficient to support his conviction for second-degree burglary on this ground.

---

[33]  *Deitchler*, 876 P.2d at 971.

[34]  *Miller*, 954 P.2d at 930.

[35]  *State v. Bybee*, 781 P.2d 316, 318 (N.M. App. 1989).

[36]  *People v. Knight*, 204 Cal. App. 3d 1420, 1424 (Cal. App. 1988).

*Why we conclude that the evidence was insufficient to support Coleman's conviction for making a false report*

Alaska Statute 11.56.800(a)(2) provides, in relevant part, that "[a] person commits the crime of false ... report if the person knowingly ... makes a false report to a peace officer that a crime has occurred or is about to occur." In the present case, Coleman was charged with making a false report based on the fact that, when Coleman was stopped by the police and questioned about why he was in the area, Coleman falsely claimed that he was in the area because he was chasing his van, which he falsely said had been stolen.

The evidence at trial established that the police responded to the burglary alarm at the bicycle shop around 4:00 a.m. After arriving at the scene, the police found two bicycles from the bicycle shop on the ground nearby. In the vicinity, the police also discovered Coleman's van, which was "high-centered" on a cement pillar in the parking lot.

The police also saw a man (later determined to be Coleman) trying to leave the scene in a taxi cab. One of the officers stopped the taxi and questioned Coleman, who was in the back seat of the cab, sweating profusely. When the officer asked Coleman why he was in the area, Coleman told a confusing story about his van being stolen and chasing the stolen van on his bicycle. Coleman could not explain why he was in a taxi cab or why he was leaving his van behind. Coleman also could not explain where the bicycle he had used to chase the van was. When the officer asked Coleman why he had not called to report the stolen van to the police, Coleman said that the police "handle things differently" and that he would "take care of it himself."

At trial, the officer testified that Coleman was clearly nervous during the police questioning and that his explanation for his presence at the scene made no sense and was not believable. Based on their suspicions that Coleman was responsible for the

burglary, the police arrested Coleman. Following his arrest, the keys to Coleman's "stolen" van were found in Coleman's pocket.

Coleman testified in his own defense at trial, denying any involvement in or knowledge of the burglary. He claimed that he had been driving his van on his way to buy a couch when he took a wrong turn and ended up high-centering his van in the parking lot of the strip mall. When the police arrived in the area, he thought that they could have been called because the high-centering had made a lot of noise. Coleman admitted that his van had not been stolen, and he asserted that he lied to the police about his van being stolen and chasing his van on his bicycle because his license was suspended and he did not want to get in trouble for driving his van. The jury subsequently convicted Coleman of making a false report under AS 11.56.800(a)(2).

On appeal, Coleman argues that his false statement about chasing his stolen van did not qualify as a false "report" of a crime under AS 11.56.800(a)(2) because it was made only in response to police questioning and it was not believed or acted on by the police. Coleman contends that "report" in this context requires "a formal disclosure with the concomitant expectation that the police will take action on the information."

Coleman's claim requires us to construe the meaning of making a false report under AS 11.56.800(a)(2). When we construe the meaning of a statute, we consider the statute's language, its purpose, and its legislative history in an attempt to give effect to the legislature's intent.[37]

Here, the plain language of AS 11.56.800(a) suggests that there is a distinction between giving "false information" and making "a false report."

---

[37] *Alyeska Pipeline*, 77 P.3d at 1234.

Under subsection (a)(1) of AS 11.56.800, it is a crime to "give[] false information to a peace officer ... with the intent of implicating another in an offense."[38] The same subsection also criminalizes "giv[ing] false information" concerning one's identity during an arrest or a criminal investigation.[39] Similarly, under subsection (a)(5), it is a crime to "give[] false information" to a public employee relating to a person's eligibility for a permanent fund dividend.[40]

In contrast, subsection (a)(2) makes it a crime to "make[] a false report to a peace officer that a crime has occurred or is about to occur."[41] Likewise, subsection (a)(3) of the statute criminalizes "mak[ing] a false report" or "giv[ing] a false alarm" that a fire or other occurrence imminently dangerous to life or property has occurred or is about to occur.[42] And under subsection (a)(4) of the statute, it is a crime to "make[] a false report" to the Department of Natural Resources concerning the condition of a dam or reservoir.[43]

Because two subsections of the statute make it a crime to give "false information," while the other three subsections of the statute declare that it is crime to make a "false report" or to give a "false alarm," we are to presume that the legislature

---

[38] AS 11.56.800(a)(1).

[39] *Id.*

[40] AS 11.56.800(a)(5).

[41] AS 11.56.800(a)(2).

[42] AS 11.56.800(a)(3).

[43] AS 11.56.800(a)(4).

meant something different by these phrases.[44] That is, we should presume that giving "false information" does not mean exactly the same thing as making a "false report."

And, in fact, when we examine the different subsections that use the same language, they appear to share a common characteristic: subsections (a)(1) and (a)(5) involve situations that are more passive — the person is giving false information to the authorities that may mislead them about a certain fact or circumstance. In contrast, subsections (a)(2), (a)(3), and (a)(4) involve situations that are more active — the person is making a false report about an occurrence that requires immediate action on the part of the authorities. In other words, making a false report contemplates that the person is doing more than just passively giving a false statement to the authorities. Instead, the person is directly engaging with the authorities and summoning them to take some immediate action based on the person's false claim.

The plain language of the statute therefore tends to support Coleman's contention that his false statement about his van being stolen did not constitute making a false report under AS 11.56.800(a)(2). The record makes clear that Coleman did not initiate the contact with the police; instead, he was contacted by the police, and he was responding to their questions about why he was in the area. In addition, although Coleman's explanation included a false statement that his van had been stolen, it was clear to the police that Coleman was not asking the police to take any action in response to this false statement. Indeed, Coleman was adamant that he had not reported the stolen van to the police, he did not want the police involved, and he would "take care of it himself."

---

[44] *See Johnson v. State*, 380 P.3d 653, 656 (Alaska 2016) (We "presume that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous") (internal citations omitted).

Coleman's argument on appeal is also supported by the legislative history for AS 11.56.800(a)(2). There is relatively little legislative history available for the offense of making a false report. But the legislative history that does exist suggests that the legislature's primary concern was that law enforcement resources would be expended on investigating reports of crimes that the person knew to be false when they made the report. The published legislative commentary to AS 11.56.800(a)(2) explains that a person is subject to criminal penalties for making a false report of a crime "because of the likelihood that substantial amounts of law enforcement resources will be misapplied in investigating the report."[45] Similarly, the Senate Judiciary Committee's discussion of the offense focused on the fact that "dispatching a police officer or several police officers on a long goose chase is a fairly serious offense."[46] For example, Senator Clem Tillion explained that the offense was intended to address the kind of situation where "a person say[s] somebody has been killed, [and] officers proceed to the scene and find someone laughing at them."[47]

The Model Penal Code, from which AS 11.56.800(a)(2) is derived, also lends support to Coleman's claim that making a false report implies that the police are being asked, or could be expected, to take action on the false report. Like AS 11.56.800(a)(2), Section 241.5 of the Model Penal Code makes it an offense to "report[] to law enforcement authorities an offense or other incident within their concern knowing that it did not occur."[48] The Commentary to this provision explains that, as

---

[45] Commentary to Alaska's Revised Criminal Code, Senate Journal Supp. No. 47 at 88, 1978 Senate Journal 1399.

[46] Minutes of Senate Judiciary Comm., House Bill 661, 0:30:24-0:31:16 (May 1, 1978).

[47] *Id.*

[48] *Model Penal Code* § 241.5(2), False Reports to Law Enforcement Authorities.

originally drafted, § 241.5 "required proof that the actor 'cause[d] a law enforcement officer to act in reliance on the false information.'"[49] But the Model Penal Code drafters later eliminated this requirement because of "the awkwardness of the causation inquiry," and because "false information of the sort covered [by this section] is likely to lead to some police action and reliance thereon."[50] The Model Penal Code commentary therefore supports the conclusion that it is crime to make a false report of a crime because of the likelihood that the police will take some action in response to the sort of information that would be included in such a "report."

On appeal, Coleman suggests that the offense should be strictly limited to circumstances where the State can prove that the defendant subjectively intended the police to take action on the false report, or circumstances where the State can prove that the police actually did take action based on the false report. We disagree. The legislative history of AS 11.56.800(a)(2) and the Model Penal Code commentary refer only to the "likelihood" that the defendant's act of falsely reporting a crime to the police will result in wasted law enforcement resources. They do not actually suggest that the State must prove that law enforcement resources were wasted in order to convict the defendant of making a false report. Nor do they suggest that the State has to prove that the defendant subjectively *intended* the police to take action and expend resources on the false report.

Coleman points out that there are some jurisdictions that include this type of subjective intent in their definition of this crime. Under Minnesota law, for example, a person is guilty of falsely reporting a crime only if the person knows that the report is

---

[49] American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, § 241.5, at 162.

[50] *Id.*

false and "intend[s] that the officer shall act in reliance upon it."[51]  Nebraska law likewise requires "an intent to instigate an investigation of an alleged criminal matter."[52]  And Missouri law recognizes a statutory defense for persons who retracted their false report "before the law enforcement officer or any other person took substantial action in reliance thereon."[53]

However, AS 11.56.800(a)(2) does not include this type of subjective intent element, and we are unwilling to read such a requirement into the statute without clear legislative history indicating that this was the legislature's intent.[54]  We are also unwilling to adopt Coleman's other bright-line proposals for this offense — specifically, his suggestion that the statute should only apply when the person has formally filed the false report, or when the person is responsible for initiating the contact with the police and summoning them to the scene.  We agree that such circumstances are relevant considerations when determining whether a false statement about a crime constitutes a "false report" under the statute.  But we do not agree that those circumstances represent the only ways that a person can commit the crime of making a false report under Alaska law.

Instead, we conclude that the crime of making a false report of a crime requires the State to prove that the person knowingly made a false statement to the police that "a crime had occurred or was about to occur" under circumstances that objectively

---

[51]  Minn. Stat. § 609.505.

[52]  Neb. Rev. St. § 28-907(1)(a).

[53]  Mo. Rev. Stat. § 575.080(2).

[54]  *See State v. Fyfe*, 370 P.3d 1092, 1094-95 (Alaska 2016) (explaining that, under Alaska's sliding scale approach to statutory interpretation, "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be").

created a reasonable likelihood that the police would act on the false claim and expend law enforcement resources doing so.

Applying these requirements to Coleman's case, we conclude that the evidence at trial was insufficient to establish that Coleman's false statement about his van being stolen qualified as a "false report" under AS 11.56.800(a)(2), even viewing the evidence in the light most favorable to upholding the jury's verdict.[55] Here, the undisputed evidence at trial showed that, in response to police questioning, Coleman made a confusing statement about chasing his stolen van in an attempt to explain his presence at the scene of the recent burglary. Coleman's statement about his purportedly stolen van did not include any details or provide the type of information that the police would need to investigate such a claim. Moreover, Coleman made clear that he was not seeking any police assistance with regard to the stolen van or expecting the police to investigate the alleged crime. In fact, Coleman directly told the police that he did not want any police involvement in the theft of his van, and he insisted that he would "take care of it himself." It was also undisputed that the police did not believe anything Coleman told them, and the police did not respond to his false claim about chasing his stolen van as though it were an actual report of a crime that would need to be investigated.

Thus, given the nature of Coleman's false statement about his van having been stolen, and the circumstances under which it was made, we conclude that the

---

[55]  *See Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008) ("When a defendant challenges the sufficiency of the evidence to support a criminal conviction, an appellate court is obliged to view the evidence, and all reasonable inferences to be drawn from that evidence, in the light most favorable to upholding ... the verdict.").

evidence was insufficient as a matter of law to establish the crime of making a false report under AS 11.56.800(a)(2).

*Coleman's other arguments*

Coleman also argues that there was insufficient evidence presented at trial that he was the person who committed the burglary, theft, and criminal mischief. When we review a claim of insufficient evidence, we must view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the jury's verdict.[56] We then determine whether the evidence, viewed in that light, was sufficient for a reasonable juror to find each element of the crime proved beyond a reasonable doubt.[57]

Here, eight to nine minutes after an alarm was triggered on one of the bicycle sheds, Anchorage police officers responded to the scene. The officers noticed that the door to one of the sheds had been forced open, and there were two bicycles on the ground nearby. The officers noticed a van in the vicinity — later identified as belonging to Coleman — "high-centered" on a cement pillar.

One of the officers then saw Coleman "running or jogging toward what looked to be ... a taxi" in the parking lot of a nearby gas station. The officer stopped the taxi and made contact with Coleman, who was by then in the back seat. When asked why he was in the area, Coleman stated that he had been chasing his van — which he claimed to have been stolen from his home — on a bicycle. Coleman later admitted that

---

[56] *See Johnson*, 188 P.3d at 702.

[57] *Id*.

this was untrue.  And Coleman could not explain why, having located his stolen van, he was now leaving the area in a taxi.

When the police directed a dog to track from the shed, the dog led the police from the shed to the location where the two bicycles were found, then to Coleman's van, and eventually to the gas station where Coleman had entered the taxi.

Coleman argues that this circumstantial evidence tying him to the shed was "merely speculative."  He also argues that the evidence from the tracking dog was not credible.

But Coleman's argument rests on viewing the evidence in the light most favorable to himself.  As explained above, we must view the evidence in the light most favorable to the jury's verdict.  We have reviewed the record, and we conclude that the evidence was sufficient for a reasonable juror to find that Coleman was the person who committed the charged crimes.

Coleman also challenges the denial of his motion for a new trial on similar grounds.  According to Coleman, "the evidence preponderates heavily against the verdicts."  Coleman thus argues that the trial court abused its discretion in denying his motion for a new trial.

We review a trial court's denial of a motion for a new trial under an abuse of discretion standard.[58]  When deciding a motion for a new trial, the trial judge does not "defer to the jury's assessments of witness credibility or the weight of the evidence; rather, the judge must reach their own independent assessment of the evidence."[59]  But

---

[58]  *Sawyer v. State*, 244 P.3d 1130, 1137 (Alaska App. 2011).

[59]  *Taylor v. State*, 262 P.3d 232, 233 (Alaska App. 2011).

a judge should grant a new trial only when the evidence supporting the conviction is "so slight and unconvincing as to make the verdict plainly unreasonable and unjust."[60]

Here, as explained previously, ample evidence was presented at trial to support the jury's verdict. We thus conclude that the trial court did not abuse its discretion in denying Coleman's motion for a new trial.

*Conclusion*

We REVERSE Coleman's conviction for making a false report under AS 11.56.800(a)(2) and remand this case to the superior court for re-sentencing, as appropriate. We otherwise AFFIRM the judgment of the superior court.

---

[60] *Id.* at 234 (internal citations omitted).

2571