NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections @ akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

KORAKANH PHORNSAVANH,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12499
Trial Court No. 3AN-13-06468 CR

O P I N I O N

No.  2691 — February 5, 2021

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances:  Kelly R. Taylor, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before:  Allard, Chief Judge, Harbison, Judge, and Suddock, Senior Superior Court Judge.[*]

Judge ALLARD.

---

[*]    Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Korakanh Phornsavanh was convicted, following a jury trial, of first-degree murder for fatally shooting Said Beshirov during a street brawl outside an Anchorage nightclub. He now appeals that conviction, raising three claims of error.

Phornsavanh's first claim is that the superior court erred when it failed to provide a defense-requested instruction on eyewitness identification. For the reasons explained in this opinion, we reject this claim.

Phornsavanh's two other claims relate to various evidentiary weaknesses in the State's case against him. Citing eyewitness testimony that pointed to a different man as the shooter, Phornsavanh argues that the evidence presented at trial was legally insufficient to support his conviction.[1] In the alternative, Phornsavanh argues that the jury's verdict was against the weight of the evidence and that the superior court erred in failing to grant his motion for a new trial in the interest of justice.[2] Phornsavanh also argues that the superior court failed to apply the correct legal standard when it evaluated his motion for a new trial based on the weight of the evidence.

For the reasons explained in this opinion, we conclude that the evidence at trial was legally sufficient to support Phornsavanh's conviction. However, we agree with Phornsavanh that the superior court failed to apply the correct legal standard when it evaluated Phornsavanh's motion for a new trial. Accordingly, we remand this case to the superior court for reconsideration of Phornsavanh's motion for a new trial under the correct legal standard.

---

[1] *See* Alaska R. Crim. P. 29; *see also Jackson v. Virginia*, 443 U.S. 307, 317 (1979).

[2] *See* Alaska R. Crim. P. 33(a).

*Background facts and prior proceedings*

On October 28, 2012, Platinum Jaxx, a nightclub in downtown Anchorage, hosted a Halloween party. Around 2:30 a.m., the nightclub closed and ushered its patrons out onto the street. Many of the patrons were in costume; many were also intoxicated.

Among the patrons leaving the club was twenty-five-year-old Korakanh Phornsavanh. Phornsavanh was wearing a red hooded sweatshirt, a red baseball cap, and black and white face paint. Phornsavanh is 5 feet 6 inches tall.

Also among the patrons was a group of four friends: Anthony Xayavongsy, his brother Blandy, and their friends Victor Senethep and Dellon Vongphrachanh. Xayavongsy and Vongphrachanh were both dressed as cowboys, with matching long-sleeved white shirts, black vests, and cowboy hats. Xayavongsy, who is 5 feet 9 inches tall, wore a red bandanna; Vongphrachanh, who is 6 feet 1 inch tall, wore a blue bandanna. Xayavongsy's brother Blandy wore a Nixon mask; Senethep wore a Reagan mask.

The victim in this case, Said Beshirov, also departed from the club. Beshirov, who was 5 feet 9 inches tall, was not wearing a costume. Instead, he was wearing a lightweight red puffer jacket.

As the patrons congregated outside the nightclub, a street brawl broke out. The brawl eventually fractured into two fights, which two patrons filmed with their cell phones. The beginning of the brawl was also captured on the nightclub's surveillance video.

The cell phone and surveillance videos show an incomplete version of what happened. In the surveillance video, Phornsavanh can be seen shoving a man in a construction vest. Soon afterwards, Blandy can be seen on the same video, throwing a woman in a yellow dress to the ground. The first cell phone video starts with the woman

in the yellow dress on the ground and shows Xayavongsy punching another woman in a black costume in the face; she also falls to the ground. The first cell phone video also shows Vongphrachanh and Senethep punching and then kicking a man in a superhero costume. Phornsavanh can be seen punching a man in a plaid shirt in the head from behind and then trading blows with Beshirov after Beshirov intervenes in the fight. The fight fractures into two groups at this point, and the second cell phone starts recording, showing Phornsavanh scuffling with the man in the plaid shirt and then exchanging punches with Beshirov. The second cell phone video then pans to the left to focus briefly on the other fight.

Shortly thereafter, the second cell phone video pans back to the right. On the video, Beshirov can be seen facing Xayavongsy and Senethep, who are standing on the sidewalk. Xayavongsy, who is holding a cowboy hat in his right hand, is gesturing with that arm pointed straight at Beshirov. Beshirov is walking toward Xayavongsy and holding both hands in the air in a placating manner.

On the left side of the frame in the second video, Phornsavanh can be seen moving quickly toward Xayavongsy, with his upper body angled toward Beshirov. Phornsavanh's right arm is close to his side. The still-frame exhibits of the video show a black shadow or spot on Phornsavanh's right hand that the prosecutor argued was a gun. Xayavongsy can be seen lowering his right arm, then quickly re-raising it and turning to look at Phornsavanh as Phornsavanh gets closer. Just as Xayavongsy re-raises his right arm again toward Beshirov, the video pans away. It is not clear from the video whether Xayavongsy is still holding his cowboy hat in his right hand or if he is holding something else.

Less than a second after the video pans away, two gun shots can be heard. Neither cell phone video captures the actual shooting. Following the shots, the second video pans back to show Beshirov lying on the street, bleeding from multiple wounds.

2691

Beshirov died at the scene. A medical examination would later determine that one of the bullets went through Beshirov's hand and entered his head, while the other bullet hit him in the upper chest. A ballistics expert would later testify that the bullets came from a .380 caliber gun, which is small enough to rest in the palm of a man's hand.

Immediately after the shots were fired, Xayavongsy, Blandy, Senethep and Vongphrachanh left the scene, driving the wrong way down a one-way street and discarding parts of their costumes along the way. Phornsavanh also left the scene in a different car.

The police interviewed multiple eyewitnesses to the shooting. Most of these eyewitnesses were intoxicated.

The eyewitnesses were inconsistent in their descriptions of the shooter. For example, most of the eyewitnesses identified the shooter as Asian, but other eyewitnesses identified him as Samoan, Alaska Native, or Black. (Xayavongsy and Phornsavanh are both Asian, although Phornsavanh's facial features were somewhat obscured by the black and white face paint.) Some eyewitnesses described the shooter as having short black hair. (Both Xayavongsy and Phornsavanh have short dark or black hair, although Phornsavanh's hair was obscured by his baseball cap.) Some eyewitnesses described the shooter as having a long, dark ponytail. (Vongphrachanh has a long, dark ponytail.)

The eyewitnesses were also inconsistent about what the shooter was wearing. Many of the eyewitnesses described the shooter as wearing a long-sleeved white shirt with a black vest. (As part of their cowboy costumes, both Xayavongsy and Vongphrachanh were wearing long-sleeved white shirts and black vests.) Two eyewitnesses described the shooter as wearing "dark clothing" without referring to any white shirts. The shooter was also described as wearing a gray zip-up hoodie, a white

tank top and jeans, or a dark brown sweater. At the time of the shooting, none of the eyewitnesses described the shooter as wearing red.

The eyewitnesses were inconsistent about the height and weight of the shooter. Several of the eyewitnesses described the shooter as similar height and build as the victim, who was 5 feet 9 inches tall with a medium build. (Xayavongsy is 5 feet 9 inches tall with a medium build.) However, three eyewitnesses described the shooter as at least 6 feet tall and 200 pounds. (Vongphrachanh is 6 feet 1 inch tall and 225 pounds.) And one eyewitness described the shooter as 5 feet 6 inches or 5 feet 7 inches tall. (Phornsavanh is 5 feet 6 inches tall.)

One eyewitness told the police that Vongphrachanh was the shooter. However, she later testified at trial that she could not remember the shooting and was guessing when she initially named Vongphrachanh.

The police were later able to exclude Vongphrachanh and Blandy (Xayavongsy's brother) as suspects based on the first cell phone video, which showed Vongphrachanh and Blandy engaged in a separate fight when the shots were fired.

Based on the eyewitness descriptions and an initial review of the cell phone videos, the police initially focused their attention on Xayavongsy as their prime suspect. Xayavongsy fit several of the descriptions, and the second cell phone video showed Xayavongsy in an apparent verbal altercation with the victim seconds before the shooting. The police did not initially consider Phornsavanh a suspect because none of the eyewitnesses had described the shooter as wearing red clothes, a red baseball cap, or black and white face paint.

As part of their investigation, the police interviewed Phornsavanh. Phornsavanh was evasive during this interview, and he initially lied about being involved in the street brawl. However, after being confronted with the video evidence of his involvement in the brawl, Phornsavanh admitted to being at the scene, although he

denied shooting Beshirov or knowing who did. Phornsavanh acknowledged that he was only feet away from Beshirov when he was shot, but he maintained that he did not know who shot Beshirov because he was looking at Beshirov at the time of the shooting.

The police also interviewed Xayavongsy. Xayavongsy, like Phornsavanh, denied shooting Beshirov or knowing who did.

At trial, the State was unable to locate Senethep, Xayavongsy's friend who was standing next to Xayavongsy at the time of the shooting. In the video, Senethep, who was wearing a Reagan mask, can be seen looking at Xayavongsy and Phornsavanh and then shifting his weight to one foot as if to run in the seconds before the shooting.

The State was also unable to locate Vongphrachanh, who left the scene in a vehicle with Xayavongsy, Blandy, and Senethep. Blandy testified at trial and denied knowing who the shooter was.

At some point, the police shifted their attention from Xayavongsy to Phornsavanh as the main suspect. Phornsavanh was later arrested and charged with first- and second-degree murder.

At the initial grand jury, the State failed to introduce the eyewitness testimony, which tended to exculpate Phornsavanh, and the superior court dismissed the indictment for failure to present exculpatory evidence. Phornsavanh was subsequently re-indicted on the same charges, and the case went to a jury trial.

*The evidence at trial*

At trial, the State's case primarily consisted of the two cell phone videos, and three expert witnesses.

*The cell phone videos*

The State's case against Phornsavanh relied chiefly on the second cell phone video, which showed the verbal encounter between Xayavongsy and Beshirov and the movements of Xayavongsy and Phornsavanh in the seconds before the shooting. The jury was provided with a playback device enabling the jury to watch the video in slow-motion or frame-by-frame. The jury was also given numbered print-outs of the individual frames.

The prosecutor argued that the video showed Phornsavanh carrying a gun and moving with deliberation to the position where he shot Beshirov. Specifically, the prosecutor argued that (1) a black mark that appears in Phornsavanh's hand in some of the frames was the gun; (2) Phornsavanh's abnormal stride showed that he was carrying a gun; (3) Senethep and Xayavongsy were looking at Phornsavanh and stepping back, which was consistent with Phornsavanh carrying a gun; and (4) Phornsavanh was looking at Beshirov and angling his body toward him, which showed that he was targeting Beshirov. The prosecutor also argued that Phornsavanh had a motive to shoot Beshirov because Beshirov had just bested him in a fist fight captured on the cell phone videos.

Unlike the prosecutor, the defense attorney emphasized the eyewitness testimony at the scene, none of which inculpated Phornsavanh and some of which inculpated Xayavongsy. The defense attorney also disputed the prosecutor's interpretation of the second cell phone video. For example, the defense attorney argued that the black shadow identified by the prosecutor as a gun in Phornsavanh's hand was actually the result of lighting and video quality, and the defense attorney pointed to other individuals in the video who appeared to have similar black spots on their hands.

The defense attorney argued that the second cell phone video actually showed that Xayavongsy was the shooter — a version of events that he pointed out was

more consistent with the eyewitness testimony. The defense attorney focused the jury's attention on the last clear frame in the video before the camera panned away and the shooting occurred. This frame shows Xayavongsy facing Beshirov with his right arm raised in a shooting position. Xayavongsy has something indiscernible in his right hand, which the prosecutor argued was the cowboy hat but the defense attorney argued was a gun. According to the defense attorney, Xayavongsy had shifted his hat to his left hand so that he could pull out a gun, and the defense attorney pointed to a place in the video where Xayavongsy lowers his arm and Phornsavanh's body obscures Xayavongsy's body as the moment when Xayavongsy switched his hat to his left hand and then took out his gun with his right hand. The defense attorney further argued that the outline of Xayavongsy's hat could be seen in his left hand in the last frame of the video before it panned away.

### The State's eyewitness identification expert

At trial, the State introduced testimony from the various eyewitnesses, mainly to discredit that testimony. As already mentioned, prior to trial, none of the eyewitnesses identified the shooter as wearing red. Instead, various eyewitnesses reported that the shooter was of the same height and build as Xayavongsy and wearing clothes that were similar to the clothes worn by Xayavongsy.

In discrediting the reliability of the eyewitness descriptions, the prosecutor relied heavily on the testimony of Dr. Geoffrey Loftus, an expert in memory and eyewitness identification who typically testifies in favor of the defense in criminal trials. Dr. Loftus described several factors that can affect the formation of memory, including duration of the event, attention, lighting conditions, alcohol, stress, and post-event circumstances. According to Dr. Loftus, the longer the duration of an event, the better the witness's memory of the event because the witness has more time to consciously

observe details. Dr. Loftus also explained that stress can be an especially distorting influence on memory, because stress inhibits the formation of memory and can also engender a falsely vivid memory as a witness revisits the stressful incident in their head or with others.

According to Dr. Loftus, many of the factors that adversely affect memory were present in this case. The shooting here was unexpected, shocking, and extremely short in duration. And while the parties disagreed as to the quality of lighting conditions, it was undisputed that it was nighttime and that the only illumination came from streetlights, nearby businesses, and cars. It was also undisputed that many of the eyewitnesses were intoxicated.

Dr. Loftus also provided testimony that was helpful to Phornsavanh's defense. Dr. Loftus testified that, as a general matter, a witness's first reporting is the most accurate. According to Dr. Loftus, if multiple witnesses provide similar independent accounts, these accounts are more likely to be accurate than independent dissimilar accounts. Relying on this expert testimony, the defense attorney focused the jury's attention on the commonalities in the eyewitness descriptions, and the fact that so many eyewitnesses identified the shooter as Asian, 5 feet 9 inches tall with a medium build, and wearing dark clothing, including a white shirt with a black vest — descriptors that pointed to Xayavongsy as the shooter, not Phornsavanh.

The defense attorney also relied on Dr. Loftus's testimony regarding how post-event information can contaminate an eyewitness's memory. This expert testimony was helpful to the defense because one of the eyewitnesses — Daniil Bogdanov — radically altered his description of the shooter at trial. In his statement to the police and in his testimony to the grand jury, Bogdanov described the shooter as wearing blue jeans and a basic shirt with a black body and white sleeves. Bogdanov's description of the shooter was consistent with many of the other eyewitnesses' descriptions and was also

consistent with Xayavongsy being the shooter; it was inconsistent with the State's theory because Phornsavanh was wearing a red hooded sweatshirt and red baseball cap.

At trial, however, Bogdanov changed his description of the shooter. Bogdanov testified that he changed his description based on an online newspaper article that he read a few days before he testified. The article reported on the defense attorney's opening statement, and it emphasized that none of the eyewitnesses had identified Phornsavanh as the shooter. The article also included a link to the second cell phone video. Bogdanov testified that he watched the video, and the video triggered "repressed memories" of the event, causing him to now "remember" that the shooter was wearing a red jacket or hooded sweatshirt with a red baseball cap. Bogdanov was the only eyewitness who testified that the shooter wore red.

Relying on Dr. Loftus's expert testimony, Phornsavanh's defense attorney attacked Bogdanov's "repressed memory," and argued that it was unreliable and tainted by the news story and the cell phone video.

Significantly, the prosecutor did relatively little to rehabilitate Bogdanov's credibility. Instead, the prosecutor argued that most, if not all, of the eyewitness testimony was unreliable and that all of the eyewitnesses were generally mistaken about what they saw or what they thought they saw.

*The State's other expert witnesses*

In addition to Dr. Loftus, the State presented two other expert witnesses — Dr. Gary Zientek, the medical examiner, and Robert Shem, a firearms expert. The prosecutor relied on these experts primarily to establish that the pool of suspects was limited to Xayavongsy and Phornsavanh.

Dr. Zientek, the medical examiner, testified that the trajectory of the bullets was from left to right — *i.e.*, the shooter was standing to the left of Beshirov. (Both Phornsavanh and Xayavongsy appear to be to the left of Beshirov on the video.) Dr. Zientek could not determine how far away the shooter was, other than to note that the shooter was likely more than two or three feet away because there was no residue around the entrance wounds.

Robert Shem, the firearms expert, testified that the shots came from a .380 caliber handgun. The gun was likely small enough to fit in the palm of a man's hand without being seen and could easily be concealed in a waistband. Shem testified that he could not tell where the shooter was standing based on where the bullet cartridges were found at the scene because cartridges tend to bounce and roll on concrete and could have been kicked if there were a lot of people in the area (as there were here). Additionally, if the gun were held sideways (which one eyewitness reported), that could affect the cartridge ejection patterns.

*Xayavongsy's trial testimony*

The State called Anthony Xayavongsy as a witness. Xayavongsy testified that he was not the shooter, that he did not see the shooting, and that he did not know who shot the victim. Xayavongsy testified that the fight started soon after he left the club with his friends. He admitted that he punched a woman in the face because she got "in [his] face." According to Xayavongsy, he was in the middle of the street brawl when all of a sudden he heard gunshots. He did not know where the gunshots were coming from, so he turned around and ran.

But after being confronted with the second cell phone video, Xayavongsy admitted that he was the man standing on the sidewalk across from the victim. Xayavongsy identified the object in his hand as a cowboy hat, and he maintained that he

– 12 –                                                                        2691

did not have a gun on him the night of the shooting. However, he testified that he did not remember being on that sidewalk or having his arm outstretched. Xayavongsy also testified that he did not recognize the man in the video in the red cap (Phornsavanh) or the victim. He claimed to know nothing of the shooting, notwithstanding his proximity to the event.

Xayavongsy testified that he "probably" knew Phornsavanh from the Anchorage night life, but he claimed that he could not recall how often he saw Phornsavanh around. When the prosecutor drew his attention to a video showing him walking out of Platinum Jaxx with Senethep and Phornsavanh, Xayavongsy testified that he did not remember leaving together and could not recall if he saw Phornsavanh that night in the club. At other points in his testimony, Xayavongsy denied knowing Phornsavanh "at all." Yet he later admitted that he had once been pulled over with Phornsavanh in his car and that they knew each other through a mutual friend.

*Phornsavanh's police interview*

Phornsavanh did not testify at trial. However, the prosecutor played the police interview in which Phornsavanh was initially evasive about his presence at the scene, and the prosecutor argued that the interview demonstrated consciousness of guilt.

*The pre-verdict motion for judgment of acquittal*

At the close of the State's case, the defense moved for a judgment of acquittal under Alaska Criminal Rule 29, arguing that the State had not presented sufficient evidence to allow a reasonable juror to find Phornsavanh guilty beyond a reasonable doubt. The court took this motion under advisement. When the defense

rested, it renewed its motion for a judgment of acquittal. The court again reserved judgment until after the verdict.[3]

*The jury's verdict and the post-verdict motion for a new trial*

The jury deliberated for two-and-a-half days, during which time the jury requested and received additional specialized equipment to magnify the cell phone video and the still frames captured from the video. The jury subsequently found Phornsavanh guilty of first-degree and second-degree murder.

After the jury reached its verdict, the defense reminded the court of the outstanding motion for judgment of acquittal. The defense also filed a motion for a new trial in the interest of justice under Alaska Criminal Rule 33, arguing that the jury's verdict was contrary to the weight of the evidence.

The parties provided substantive briefing on both motions, and the court heard oral argument on the motions. After considering the arguments, the superior court denied both the motion for judgment of acquittal and the motion for a new trial in a six-page written order.

At sentencing, the court merged the second-degree murder count into the first-degree murder count and sentenced Phornsavanh to 65 years' imprisonment with 20 years suspended (45 years to serve).

This appeal followed.

*Phornsavanh's eyewitness jury instruction claims*

As previously mentioned, one of the eyewitnesses, Daniil Bogdanov, changed his description of the shooter at trial. Prior to trial, Bogdanov had described the

---

[3]  *See* Alaska R. Crim. P. 29(b).

shooter as Samoan, the same height and weight as Beshirov, wearing dark blue jeans and a long sleeved shirt with white sleeves and a black body. This description suggested that Xayavongsy was the shooter. At trial, however, Bogdanov described the shooter as wearing a red hooded sweatshirt and red baseball cap. This description suggested that Phornsavanh was the shooter. Bogdanov claimed that viewing the cell phone video a few days before he testified helped him to remember what he actually saw. Bogdanov was the only witness who identified the shooter as wearing red.

After Bogdanov testified, one of the jurors approached the judge in chambers and asked, in the presence of the judge's law clerk and assistant, if witnesses were subject to the same requirements as jurors — that is, whether witnesses were prohibited from discussing the case or doing any independent investigation or research. Later, when the court asked the juror to relay the question to the parties on record, the juror stated he was concerned that "at least one witness . . . had actually gone out and seen a video, and it ha[d] colored his opinion." The juror expressed his skepticism of Bogdanov's changed description, and he asked the court whether the jury should accept his statements.

After requesting that the juror not voice these concerns to the other jurors at this stage, the court conferred with the parties regarding how to respond to the juror's question. The defense attorney proposed an instruction that directed the jury to Dr. Loftus's expert testimony:

> You have heard that an eyewitness in this case, Daniil Bogdanov, reviewed a cell phone video and media report of opening statements in this trial prior to testifying. While that conduct did not violate the law, it is something you should consider in evaluating the credibility of Mr. Bogdanov's current stated memory of the events of this case. You may also consider the trial testimony of the State's own expert witness, Dr. Geoffrey Loftus, as well as evidence of Mr.

– 15 –

Bogdanov's previous stated memories and any other relevant factors in evaluating the credibility of Mr. Bogdanov's current stated memory.

The prosecutor objected to the defense's proposed instruction, and instead offered a more generic instruction that directed the jury to the general witness credibility instruction. The superior court adopted the State's proposed instruction with one small change, and the jury was subsequently instructed as follows:

At the beginning of trial, the court gave you an instruction regarding the conduct of jurors to guide you as jurors during the course of the trial. The instruction included an admonition not to view any outside media material concerning the trial. Certain witnesses have testified that they saw media accounts of the trial prior to testifying. Witnesses in a trial are not given the same admonition by the court as jurors, and there is no instruction or requirement that they refrain from viewing media related to the case. A witness who has viewed any media coverage of the trial has not violated any court order or law. But you are to judge the credibility of all witnesses using the factors outlined in instruction number 5.

In adopting the State's proposed instruction, the court made clear that the defense was still entitled to argue the points contained in the defense's proposed instruction to the jury. And, indeed, the defense attorney argued these points during closing argument.

On appeal, Phornsavanh argues that it was reversible error for the superior court to give the State's proposed instruction instead of the defense's proposed instruction. But, as a general matter, as long as the jury is properly instructed on the law, a trial court "has broad discretion to determine whether to give instructions specially tailored to the case at hand."[4] Here, the instruction informed the jury that Bogdanov had

---

[4]  *Young v. State*, 374 P.3d 395, 405 (Alaska 2016) (quoting *Power Construction, Inc.*
(continued...)

not broken any laws or court rules, and it directed the jury to assess the credibility of the eyewitnesses for itself. As the court noted, the State's instruction answered the juror's question and was a "fair response" to the jury's question.

Having reviewed the trial as a whole, we do not believe that such a generic instruction would have had the effect of improperly "strengthening" Bogdanov's testimony in the eyes of the jury, as Phornsavanh claims. Nor is there any evidence that it was used that way by the prosecutor. To the contrary, the record shows that the prosecutor did little to rehabilitate Bogdanov in the eyes of the jury. Instead, the prosecutor's strategy was to argue that most, if not all, of the eyewitness testimony was unreliable.

Given these circumstances, and given the fact that the defense attorney was allowed to argue the points contained in the defense-requested instruction to the jury, we find no abuse of discretion in the superior court's choice of instruction.

In his briefing on appeal, Phornsavanh also raises a separate, but related, claim of plain error. Phornsavanh argues that the superior court erred in failing to give a specialized eyewitness reliability instruction pursuant to the Alaska Supreme Court's decision in *Young v. State*.[5] (We note that *Young* was decided after Phornsavanh's trial.)

In *Young*, the supreme court advised trial courts that, in cases where eyewitness identification is a significant issue, the trial court "should issue an appropriate jury instruction that sets out the relevant factors affecting [eyewitness] reliability."[6] The supreme court also made clear, however, that the absence of such a specialized

---

[4]   (...continued)
*v. Taylor & Hintze*, 960 P.2d 20, 29 (Alaska 1998)).

[5]   *Young*, 374 P.3d at 428.

[6]   *Id.*

instruction is not automatic grounds for reversal. Instead, the reviewing court must determine whether the defendant was actually prejudiced by the absence of such a specialized instruction in a given case.[7]

Here, we are confident that the absence of a specialized *Young* instruction did not prejudice Phornsavanh. The purpose of such an instruction is to educate the jury about factors that can affect eyewitness reliability because such factors are generally not known to the public and are not necessarily matters of common sense.[8] But, unlike most juries, Phornsavanh's jury was well-informed about the factors that affect eyewitness reliability. Dr. Loftus testified extensively regarding factors affecting reliability, and both parties relied on Dr. Loftus's expertise.

Given this extensive expert testimony and the clear alignment of the parties on the importance of this expert testimony, we find no prejudice in the failure to give a specialized *Young* instruction.

*Phornsavanh's claim that the evidence presented at trial was legally insufficient or, in the alternative, that the jury's verdicts were against the weight of the evidence*

Phornsavanh argues that the evidence at trial was legally insufficient to support his conviction and the superior court therefore erred in denying his motion for judgment of acquittal. He argues, in the alternative, that the verdict was contrary to the weight of the evidence and that the superior court erred in denying his motion for a new trial. He also asserts that the superior court applied the wrong legal standard when it decided his motion for a new trial.

We address Phornsavanh's sufficiency claim first.

---

[7] *Id.* at 429-30.

[8] *Id.* at 428.

*Was the evidence presented at trial legally sufficient to convict Phornsavanh?*

Due process requires that the essential elements of a crime be proven beyond a reasonable doubt.[9] Because "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt," the United States Supreme Court has held that the courts have a constitutional duty to determine whether the evidence presented at trial is sufficient to support the defendant's conviction.[10]

Alaska Criminal Rule 29 is one means of protecting a defendant's constitutional right to proof beyond a reasonable doubt. Under Criminal Rule 29(a), a defendant may move for a judgment of acquittal at the close of the State's evidence or at the close of all the evidence.[11] The trial court is authorized to reserve decision on the motion until after the jury returns with a verdict or the jury is discharged without having returned a verdict.[12] If the motion for judgment of acquittal is denied, the defendant may renew the motion within five days after the jury is discharged and may include, in the alternative, a motion for a new trial under Criminal Rule 33.[13] A defendant can also challenge the sufficiency of the evidence for the first time on appeal as a claim of plain

---

[9] *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see also In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

[10] *Jackson*, 443 U.S. at 317-18; *see also Esmailka v. State*, 740 P.2d 466, 470 (Alaska App. 1987) (noting that the Alaska rule regarding sufficiency of the evidence is in accord with the constitutional requirements outlined in *Jackson*).

[11] Alaska R. Crim. P. 29(a). The court may also grant a judgment of acquittal on its own motion. *Id.*

[12] Alaska R. Crim. P. 29(b).

[13] *Id.*

error.[14]  Whether the evidence presented at trial is legally sufficient to support a defendant's conviction is a question of law that we review *de novo*.[15]

The standard a trial court must use to determine whether the defendant is entitled to a judgment of acquittal is the same standard that applies to an appellate court's consideration of a claim of insufficiency on appeal.  In both instances, the court is not permitted to reweigh the evidence or assess witness credibility — those are matters for the jury to decide.[16]  Instead, the court must view all evidence presented at trial, and all reasonable inferences to be drawn from that evidence, in the light most favorable to the jury's verdict, and must then determine whether, viewing the evidence in this manner, a fair-minded fact finder could find proof beyond a reasonable doubt on all essential elements of the crime.[17]

---

[14]  *See Shafer v. State*, 456 P.2d 466, 467-68 (Alaska 1969) (holding that the defendant did not waive his right to question the sufficiency of the evidence by failing to move for a judgment of acquittal and that a trial court commits plain error when it fails to enter a judgment of acquittal in a case where the evidence is insufficient to sustain the conviction); *see also* Alaska R. Crim. P. 29(a) (authorizing a trial court to grant judgment of acquittal "on its own motion" even if the defendant did not move for judgment of acquittal).

[15]  *See Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976).

[16]  *See Ratliff v. State*, 798 P.2d 1288, 1291 (Alaska App. 1990) ("[T]he weight and credibility of evidence are matters for the jury to consider in reaching a verdict, not for the reviewing court to decide in ruling on the legal sufficiency of the evidence.").

[17]  *See Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008); *Simpson v. State*, 877 P.2d 1319, 1320 (Alaska App. 1994); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We note that this standard is sometimes described as requiring the court to view "'only those facts in the record most favorable to the prosecution.'" *See, e.g.*, *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981) (quoting *Martin v. City of Fairbanks* 456 P,2d 462, 464 (Alaska 1969)).  There is nothing inherently wrong with this formulation of the standard, provided that it is interpreted to mean that the court must view *all* the evidence in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319 (emphasizing that judicial review

(continued...)

Thus, in the current case, we are required to resolve all the conflicts in favor of the verdict and assume that the jury rejected almost all of the eyewitness testimony as unreliable. We are also required to assume that the jury found Xayavongsy's trial testimony credible. And we are required to assume that the jury found the State's interpretation of the second cell phone video persuasive.

On appeal, Phornsavanh points to various reasons to doubt some of this evidence. He argues, for example, that no reasonable fact-finder could find Bogdanov's "recovered" memory credible. He also argues that no reasonable fact-finder could find the shadow in Phornsavanh's hand to be a gun. But the jury did not need to believe, beyond a reasonable doubt, that Bogdanov's "recovered" memory was reliable or that the shadow was definitely a gun to convict Phornsavanh. There was other evidence that could have constituted proof beyond a reasonable doubt, when viewed in the light most favorable to upholding the verdict. That evidence included: (1) forensic evidence from the ballistics expert and the medical examiner that tended to prove that the shooter had to be either Phornsavanh or Xayavongsy; (2) Xayavongsy's testimony that he was not the shooter; (3) expert testimony from Dr. Loftus establishing reasons to doubt the accuracy and reliability of the contradictory eyewitness testimony; (4) video evidence that showed purposeful body language that was consistent with Phornsavanh rapidly approaching Beshirov as if preparing to turn and shoot him; (5) video evidence suggesting that Phornsavanh would have been in the line of fire if Xayavongsy had been

---

17 (...continued)
includes "*all of the evidence . . .* in the light most favorable to the prosecution"). But because this formulation could be misinterpreted as suggesting that the review need not include all the evidence presented at trial, we discourage its use in future cases. *See People v. Johnson*, 606 P.2d 738, 751 (Cal. 1980) (noting that judicial review of the sufficiency of the evidence that views only parts of the record in isolation would contravene the constitutional requirements of *Jackson*).

the shooter; (6) video evidence of a dark shadow in Phornsavanh's hand that could be a gun; (7) video evidence of Phornsavanh's motive to shoot Beshirov in retaliation of Beshirov's recent pummeling of him; and (8) Phornsavanh's evasions in his interview with the police.

Viewing all of this evidence in the light most favorable to upholding the verdict, we conclude that a rational trier of fact could find Phornsavanh guilty beyond a reasonable doubt, and the superior court therefore did not err when it denied his motion for judgment of acquittal.

*Was the jury's verdict contrary to the weight of the evidence?*

A trial court's authority to grant a motion for a new trial if it finds the jury verdict contrary to the weight of the evidence is derived from common law and is deeply entrenched in both state and federal procedural law.[18]  As one leading treatise explains, "far from being a denigration or a usurpation of jury trial, [the judge's power to set aside the verdict] has long been regarded as an integral part of trial by jury as we know it."[19] As commentators and courts have noted, a trial judge "does not sit to approve

---

[18]  *See* Cassandra Burke Robertson, *Invisible Error*, 50 Conn. L. Rev. 161, 170 (2018) ("By the time of the 1768 publication of *Blackstone's Commentaries on the Laws of England*, it was already well established that the judge could and should grant a new trial if convinced that the jury's verdict was contrary to the 'clear weight' of the evidence.  This responsibility — often known as the 'thirteenth juror' rule — was incorporated into the early common law of the original colonies, and subsequently became part of both state and federal procedure throughout the United States.").

[19]  11 Mary Kay Kane, *Wright & Miller Fed. Prac. & Proc. Civ.* § 2806 (3d ed. 2020); *see also Smith v. Times Pub. Co.*, 36 A. 296, 309 (Pa. 1897) (Williams, J., concurring) ("[Jurors] are not, and have never been, independent of the court of which they are a part, but their verdicts must meet the approval, or at least they must not offend the sense of justice, of the presiding judge.").

miscarriages of justice,"[20] and the authority to grant a new trial based on the weight of the evidence "may be the only safeguard available against a miscarriage of justice by the jury."[21]

Under Alaska Criminal Rule 33, a trial court is authorized to grant a motion for a new trial "in the interest of justice" if the trial court finds that the jury's verdict is contrary to the weight of the evidence.[22] The decision to grant or deny a motion for a new trial is entrusted to the sound discretion of the trial court.[23] An appellate court will overturn that decision only if it finds an abuse of discretion.[24]

When a trial court rules on a motion for a new trial, it sits as a metaphorical "thirteenth juror," independently weighing the evidence and evaluating for itself the credibility of the witnesses.[25] However, mere disagreement with the jury's verdict is not

---

[20]   11 Mary Kay Kane, *Wright & Miller Fed. Prac. & Proc. Civ.* § 2806 (3d ed. 2020).

[21]   6 Wayne R. LaFave, et al., *Criminal Procedure* § 24.6(d) at 86-87 n.51 (4th ed. 2020) (citing *State v. Ellis*, 453 S.W.3d 889, 899 (Tenn. 2015)); *see also United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990), *amended*, 910 F.2d 467 (7th Cir. 1990) (emphasizing that "if the judge believes there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted — he has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial").

[22]   Alaska R. Crim. P. 33 ("The court may grant a new trial to a defendant if required in the interest of justice."); *Amidon v. State*, 565 P.2d 1248, 1262 (Alaska 1977); *Howell v. State*, 917 P.2d 1202, 1212 (Alaska App. 1996).

[23]   *See Hunter*, 364 P.3d at 448 ("We commit this determination to trial courts' sound discretion based on our trust in their position, expertise, and humility. History has indicated that this trust is well deserved.").

[24]   *Id.* at 447; *Dorman*, 622 P.2d at 454.

[25]   *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015); *Dorman*, 622 P.2d at 454.

enough to invalidate a jury's verdict.[26] A trial court's discretion to grant a new trial should be exercised "when necessary to prevent injustice,"[27] but it is otherwise intended to be used "sparingly and with caution."[28] A jury verdict is not to be overturned lightly.[29]

Although the authority of a trial court to grant a new trial on the ground that the verdict was contrary to the weight of the evidence is clear, "[t]he standard that is to control in passing on motions of this kind is not."[30] Part of the difficulty is the "recurrent tendency" of courts to confuse the standard for deciding a motion for a new trial based on the weight of the evidence with the standard for deciding a motion for a judgment of

---

[26] *Hunter*, 364 P.3d at 448.

[27] *Id.* (quoting 12 James W. Moore, *Federal Practice* § 59.13[1], at 59-38 (3d ed. 2015)); *see United States v. Parelius*, 83 F. Supp. 617, 618 (D. Haw. 1949) ("If the judge sits as a thirteenth juror . . . he should act in preventing injustice when deliberated discretion prompts such act.").

[28] *See United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980) ("This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice."); 11 Mary Kay Kane, *Wright & Miller Fed. Prac. & Proc. Civ.* § 2806 (3d ed. 2020) ("[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of the judge's own doubts on the matter."); *cf. Hunter*, 364 P.3d at 448 ("Experience has shown that there is little cause for concern about trial courts ordering new trials too frequently: [s]uch orders are a distinct exception.").

[29] *Hunter*, 364 P.3d at 448; *Dorman*, 622 P.2d at 454; *see also* 3 Sarah N. Welling, *Wright & Miller Fed. Prac. & Proc. Crim.* § 582 (4th ed. 2020) ("The power to grant a new trial [based on the weight of the evidence] should be invoked only in exceptional cases, where the evidence weighs heavily against the verdict.").

[30] 11 Mary Kay Kane, *Wright & Miller Fed. Prac. & Proc. Civ.* § 2806 (3d ed. 2020).

acquittal.[31]  As already explained, when a trial court rules on a motion for judgment of acquittal, the court is required to view the evidence — and all reasonable inferences derived from that evidence — in the light most favorable to upholding the jury's verdict.[32]  In contrast, when a trial court rules on a motion for a new trial based on the weight of the evidence, the court must independently weigh the evidence and make its own credibility determinations.[33]  Because of this, a court may set aside a verdict as unjust even when the evidence is otherwise legally sufficient to support the verdict.[34]

In the current case, Phornsavanh moved for a judgment of acquittal and he also moved for a new trial on the ground that the guilty verdict was contrary to the weight of the evidence.  The superior court resolved both motions in a single written order.  In the portion of the order addressing the new trial motion, the superior court acknowledged that it was required to independently assess the weight of the evidence and the credibility of the witnesses without deference to the jury's view of these matters.  But the court's analysis of the new trial motion nevertheless repeatedly referred to an abstract "fact-finder" and what that fact-finder could "reasonably infer" from the evidence.  The court gave contradictory statements of its own view of what the evidence was, and at one point even noted in a footnote that, if this had been a bench trial, the

---

[31]  *Id.*

[32]  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008).

[33]  *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015).

[34]  *Id.*; *see also United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986) (affirming both the trial court's denial of a motion for judgement of acquittal and the trial court's granting of a new trial to avoid injustice because "[a] district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal").

court "might well have not found that the state had proven its case beyond a reasonable doubt." The court did not explain what it meant by that footnote, and, at sentencing, the court was adamant that it "want[ed] to make it clear that [its] personal opinion has never been expressed and will not be."

Phornsavanh argues that the superior court failed to apply the correct legal standard when it assessed his motion for a new trial based on the weight of the evidence. We agree. When a trial court rules on a motion for a new trial based on the weight of the evidence, the trial court must take a "'personal view of the evidence'" and "'exercise its discretion and independently weigh the evidence,'" without reference to what "reasonable jurors" could find.[35] The trial court must then "use its discretion to determine whether a verdict is against the weight of the evidence — not merely whether the trial court disagrees with the verdict — and whether a new trial is necessary 'in the interest of justice,' that is, 'to prevent injustice.'"[36]

"It is indisputable that a primary goal, perhaps the paramount goal, of the criminal justice system is to protect the innocent accused against erroneous conviction."[37] Thus, "[i]f the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal,

[35] *Hunter*, 364 P.3d at 452-53 (quoting *Kava v. American Honda Motor Corp*, 48 P.3d 1170, 1177 (Alaska 2002)).

[36] *Id.* at 448 (quoting *Kava*, 48 P.3d at 1176-77 and Alaska R. Civ. P. 59(a)).

[37] *Shaw v. State, Dep't of Admin*, 861 P.2d 566, 570 (Alaska 1993); *see also Yates v. Aiken*, 484 U.S. 211, 214 (1988) ("[I]t is far worse to convict an innocent man than to let a guilty man go free." (quoting *In re Winship*, 397 U.S. 358, 372 (1970))); 1 Lafave, et al., *Criminal Procedure* § 1.5(e), at 243-57 (4th ed. 2020); *cf. United States v. Polin*, 824 F.Supp. 542, 551 (E.D. Pa. 1993) (concluding that new trial is warranted if there is a "real concern" that the defendant is innocent), *aff'd*, 22 F.3d 304 (3d Cir. 1994).

the district judge may be obliged to grant a new trial."[38]  Likewise, a trial court should grant a motion for a new trial in "exceptional circumstances" such as when there is "a real concern that an innocent person may have been convicted."[39]  Granting a motion for a new trial results only in a new trial; jeopardy does not attach.[40]

Because it is the trial court that has viewed the evidence and heard the witnesses, it is the trial court that is in the best position to determine if the interests of justice require a new trial.[41]  An appellate court will reverse a trial court's ruling on a motion for a new trial only if it finds that the trial court abused its discretion.[42]  In the context of a trial court's denial of a motion for a new trial based on the weight of the evidence, an appellate court will find an abuse of discretion only if the evidence supporting the verdict is "so slight and unconvincing as to make the verdict plainly unreasonable and unjust."[43]

In a recent civil case, *Hunter v. Philip Morris USA, Inc.*, the Alaska Supreme Court noted that this Court has erroneously referred to the "so slight and

---

[38]  *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990), *amending* 902 F.2d 604 (7th Cir. 1990)).

[39]  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ("There must be a real concern that an innocent person may have been convicted.  It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'").

[40]  *Tibbs v. Florida*, 457 U.S. 31, 45 (1982).

[41]  *Hunter*, 364 P.3d at 447-48; *see also United States v. Morales*, 902 F.2d 604, 605 ("Because the trial judge is in a better position than we to evaluate such a motion — he heard the witnesses and lawyers and watched the jurors as they listened to the evidence — the standard of appellate review is, as the cases cited indicate, a highly deferential one."), *amended*, 910 F.2d 467 (7th Cir. 1990).

[42]  *Hunter*, 364 P.3d at 448.

[43]  *Id.* at 449 (quoting *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964)).

unconvincing" *appellate* standard as though it applied to trial courts deciding a motion for a new trial in the first instance.[44] We accept the supreme court's correction to our jurisprudence, and we hereby disavow our cases that have erroneously confused the two standards.[45]

In *Hunter*, the supreme court held that the appropriate standard for a trial court to use in a civil case when determining whether the verdict is against the weight of the evidence is the standard articulated in *Kava v. American Honda Motor Corporation*:

> [A] trial court may set aside a verdict and order a new trial in the interest of justice if the verdict is against the weight of the evidence. In deciding a motion for a new trial on this basis, the court must use its discretion and independently weigh the evidence. A court may set aside a verdict as being against the weight of the evidence even when there is substantial evidence to support it.[46]

The supreme court noted that additional guidance could be found in the language of the rule, which authorizes a trial court to grant a new trial "if required in the interest of justice."[47] The court also directed trial courts to the most recent edition of *Moore's Federal Practice*, which suggests that more complex cases deserve a more exacting

---

[44] *Id.* at 448-49.

[45] *See, e.g.*, *Taylor v. State*, 262 P.3d 232, 234 (Alaska App. 2011); *White v. State*, 298 P.3d 884, 885-86 (Alaska App. 2013); *Coleman v. State*, 407 P.3d 502, 512 (Alaska App. 2017); *Adams v. State*, 440 P.3d 337, 341 (Alaska App. 2019). *Contrast Howell v. State*, 917 P.2d 1202, 1212 (Alaska App. 1996) (properly identifying the "so slight and unconvincing" standard as an appellate standard).

[46] *Hunter*, 364 P.3d at 447-48 (quoting *Kava v. American Honda Motor Corp.*, 48 P.3d 1170, 1176 (Alaska 2002)).

[47] *Id.* at 448 (quoting Alaska R. Civ. P. 59(a)).

scrutiny and again emphasizes that a trial court's discretion should be exercised "when necessary to prevent injustice."[48] However, the supreme court otherwise declined to "further refine" the *Kava* standard, concluding that any further attempts to refine the standard "may run the significant risk of muddling more than they clarify."[49]

On appeal, the State argues that the holding in *Hunter* does not apply to Phornsavanh's case because *Hunter* was a civil case. But we perceive no reason why the standard for granting a new trial should be higher in a criminal case than it is in a civil case. The language of the civil and criminal rules are identical and they both derive from the same common law tradition. Alaska Civil Rule 59(a) authorizes the granting of a new trial "if required in the interest of justice." Alaska Criminal Rule 33(a) likewise authorizes a new trial "if required in the interest of justice." Accordingly, in our view, the criticisms of various new trial formulations discussed in *Hunter* are equally apt when applied to criminal cases. We likewise conclude that *Hunter*'s emphasis on the trial court's broad discretion and the need for the trial court to take a "personal view" of the evidence provides useful guidance for trial courts in criminal cases.[50]

The *Hunter* decision was issued four months after the superior court issued its decision denying Phornsavanh's motion for a new trial. The superior court therefore did not have the benefit of *Hunter*'s clarification of the trial court standard. Instead, the court relied on our prior misleading case law, and the court denied Phornsavanh's motion for a new trial because it found that the evidence was not "so slight and unconvincing as to make the verdict plainly unreasonable and unjust." But, as just explained, this is the

---

[48] *Id.* (citing 12 James W.M. Moore, *Moore's Federal Practice* § 59.13[1], at 59-39 (3d ed. 2020)).

[49] *Id.*

[50] *Id.* at 452 (quoting *Kava*, 48 P.3d at 1177).

standard for appellate courts when reviewing a trial court's denial of a motion for a new trial. It is not the standard that should be used by the trial court in the first instance.

Because we cannot determine what the superior court would have ruled had it understood the singular importance of its role in independently assessing the motion for a new trial in the interest of justice, we conclude that a remand for reconsideration of Phornsavanh's motion for a new trial under the correct legal standard is required.

*Conclusion*

This case is REMANDED to the superior court for reconsideration of the motion for a new trial on the ground that the verdicts were against the weight of the evidence. We retain jurisdiction. The superior court shall hold a hearing and transmit its findings to this Court within 90 days of this decision. This deadline may be extended by the superior court for good cause and notification to this Court.