NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

LINCOLN N. RILEY,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13199
Trial Court No. 3PA-13-01289 CR

O P I N I O N

No. 2727 — July 22, 2022

Appeal from the Superior Court, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Marilyn J. Kamm, Attorney at Law, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Clyde "Ed" Sniffen Jr., Acting Attorney General, Juneau, for the Appellee.

Before: Wollenberg, Harbison, and Terrell, Judges.

Judge WOLLENBERG.

Lincoln N. Riley was convicted, following a jury trial, of one count of second-degree sexual abuse of a minor and two counts of attempted second-degree sexual abuse of a minor for conduct involving eight-year-old C.S. Riley now appeals his

two attempt convictions (but not his conviction for the completed crime of second-degree sexual abuse of a minor).

Riley's challenges stem from the superior court's decision to amend the elements instructions for the two attempt counts after closing arguments and after the instructions had been read to the jury. Specifically, at the State's request, the court deleted language identifying the specific attempted sexual contact ("penis to genitals" and "hand to genitals"), leaving the elements instructions to refer more generally to "sexual contact." During deliberations, the jury inquired about the change. The court responded that, although the indictment contained allegations of specific conduct, those allegations were not elements of the charges; the State was required only to prove "sexual contact" or "attempted sexual contact" beyond a reasonable doubt.

On appeal, Riley raises several claims related to these events.

First, Riley argues that, by removing the specific allegations of attempted sexual contact from the elements instructions, the superior court constructively amended the two attempt charges, such that Riley was convicted of crimes different from those for which he was indicted. Riley also argues that the amendments prejudiced his defense because he relied on the original instructions in his closing argument.

Second, Riley contends that the court's response to the jury's question was improper.

Finally, Riley argues that the trial court erroneously denied his motion for a new trial based on the changes to the jury instructions.

For the reasons discussed in this opinion, we agree with Riley that the superior court erred in amending the jury instructions after closing arguments. While we do not find a fatal variance between the charges for which Riley was indicted and the charges for which he was convicted, we conclude that the superior court's modification

of the instructions violated Alaska Criminal Rule 30(a).[1]  Having closely reviewed the record, we further conclude that this error — while harmless with respect to one of the attempt charges — prejudiced Riley's defense with respect to the other attempt charge.

Accordingly, we reverse Riley's conviction for that offense (Count I).  We otherwise affirm the judgment of the superior court.

*Underlying facts*

Cynthia and Lincoln Riley were friends with C.S.'s mother, and C.S. often spent time at their home.  Although C.S. was not related by blood to the Rileys, C.S. referred to the Rileys as her grandparents.

On March 8, 2013, when C.S. was eight years old, C.S. spent the night at the Rileys' cabin.  When Cynthia and Lincoln Riley went to bed upstairs, C.S. remained in the living room downstairs and tried to fall asleep on the couch.

C.S. testified that, at some later point, Lincoln Riley stumbled back into the living room and approached her.  C.S. could smell alcohol on his breath.  Riley began speaking to her, calling her pretty and a "hottie."  He also tried to put his hand down the back of C.S.'s pants.

C.S. got up to leave, but Riley sat down on the couch and pulled her onto his lap.  C.S. noticed that Riley's pants were pulled down slightly, exposing his genitals. C.S. felt Riley "rubbing" against her; she also described it as "humping" in an interview with a trooper.  According to C.S., she made a few attempts to stand up, but Riley kept pulling her back down into his lap.

---

[1]  Alaska Criminal Rule 30(a) governs the provision of jury instructions and provides, in relevant part:  "The court shall inform counsel of the final form of jury instructions prior to their arguments to the jury."

Eventually, C.S. told Riley that she was going upstairs and left to join Cynthia Riley in the bedroom. As C.S. got into bed with Cynthia, C.S. told Cynthia that Riley was being "weird and inappropriate." Riley then came upstairs and turned on the television, causing Cynthia and C.S. to go downstairs to try to sleep on the couch. When Riley followed them, they returned to the bedroom upstairs.

C.S. testified that some time later, Riley came back upstairs and got into bed next to her. Riley began to touch C.S.'s legs over her pajama pants; he moved his hands up her legs before stopping right below C.S.'s crotch and asking her where she wanted to be touched. After telling Riley to stop, C.S. woke Cynthia and told her that Riley was being "weird" again. Cynthia then switched places with C.S. in the bed so that C.S. would no longer be next to Riley.

The next day, C.S. told Cynthia that she had seen Riley's "peepee." C.S. later told her mother what had happened, and her mother called 911. When interviewed by the police, Riley reported that C.S. saw his penis only because he had his pants down after urinating in the downstairs bucket. (The Rileys' cabin did not have running water.)

*Prior relevant proceedings*

A grand jury indicted Riley for two counts of attempted second-degree sexual abuse of a minor (Counts I and II)[2] and one count of second-degree sexual abuse of a minor (Count III).[3] The indictment included "to-wit" language describing the specific type of sexual contact that was alleged in each of the three counts: Count I alleged attempted "penis to genitals" contact; Count II alleged attempted "hand to genitals" contact; and Count III alleged completed "genitals to buttocks" contact.

---

[2] AS 11.41.436(a)(2) & AS 11.31.100(a).

[3] AS 11.41.436(a)(2).

At trial, Riley testified in his own defense, maintaining that C.S. saw his penis only when he used the downstairs bucket to urinate.[4] He admitted that he may have slapped her on the butt "like they do in football" earlier that day as a way of saying "good job" for doing well in her Girl Scout cookie sales.

At the close of the evidence, the parties discussed and approved a packet of jury instructions that had been proposed by the State. Instruction No. 10 recited the charges in the indictment, including the "to-wit" language specifying the particular sexual contact alleged in each count. Instruction Nos. 11 and 12, as initially drafted, contained the elements of the two attempt charges and repeated the specific sexual contact alleged in the indictment — "penis to genitals" for Count I and "hand to genitals" for Count II. (Instruction No. 13 provided the elements for Count III, the completed charge, and did not contain any identifying "to-wit" language, instead containing only the broader term, "sexual contact.") The statutory definition of "sexual contact" was set out in a separate instruction.[5]

Before closing arguments, the court read a general instruction explaining the purpose of the attorneys' arguments and the fact that the arguments did not constitute evidence. In the State's closing argument, the prosecutor then outlined the three charges and explained that "there are specific acts that the State is alleging for each of these counts":

> [E]ssentially Count I is for pulling her onto his lap and attempting to engage in sexual contact. Count II is for attempting to fondle her in bed, like put his hand on her

---

[4] Riley initially entered into a Criminal Rule 11 plea agreement with the State that resolved this case and a second unrelated case. During post-conviction relief proceedings, however, the trial court allowed Riley to withdraw his guilty plea after the State indicated its non-opposition. Riley then proceeded to trial in both cases.

[5] *See* AS 11.81.900(b)(61).

genitals. . . . And Count III is for what she describes as humping her on the couch, putting his body against her body, and touching his genitals to her buttocks or her back.

In his closing argument, Riley's attorney discussed the elements of the two attempt offenses and generally argued that Riley did not intend to engage in sexual contact with C.S. With regard to Count I, counsel specifically argued that Riley lacked the intent to have his penis touch C.S.'s genitals:

Did he admit to it? Did he say to the officers, oh yes, I tried to have — I tried to put my penis to her genitals. Did he say that? . . . Was there any statement from [C.S.] saying yeah, he was trying to put his penis to my genitals? No. I don't know what his intent was. . . . [W]hen she testified, she said . . . she felt his chest. She could not feel his genitals on her. Well, there's no penis to genitals there. And if she didn't feel it, he obviously didn't do it.

After the parties completed their arguments, the court read the remaining instructions to the jury.

But before the court released the jury for deliberations, the prosecutor asked for a bench conference. At the bench conference, the prosecutor asked the court to delete from Instruction Nos. 11 and 12 — the instructions identifying the elements of the attempt offenses (Counts I and II) — the language identifying the specific conduct alleged in the indictment. According to the prosecutor, the "to-wit" language in the indictment was intended solely to give notice to the defendant of the conduct alleged — and she argued that including the language in the instructions identifying the elements of the attempt charges was not "fair" because it presented an "overly narrow" characterization of the sexual contact element. The prosecutor acknowledged that removing the language would be prejudicial if Riley had relied on it, but she described Riley's defense as a complete denial that did not hinge on a dispute as to the particular

body part he allegedly tried to touch. Riley's attorney objected, arguing that he had already relied upon that language in his closing argument.

The court agreed with the prosecutor that Riley's counsel had not substantively relied on the specific acts alleged and found that removing the identifying language would not be prejudicial. Accordingly, the court granted the State's request and removed the phrases "penis to genitals" and "hand to genitals" from the elements instructions for the two attempt charges. But the court left these phrases in Instruction No. 10, the jury instruction that listed all three counts as stated in the indictment.

The court then informed the jury that it was "mak[ing] a slight change to two of the instructions" and re-read the amended elements instructions for the two attempt offenses (Instruction Nos. 11 and 12). The court then exchanged the old version of the instructions for a revised copy.

After the jury began deliberating, the court received a note from the jury. In the note, the jury asked about the change to the instructions: "Instruction No. 10 still talks about 'penis to genitals' in Count I, 'hand to genitals' [in] Count II[,] & 'genitals to buttocks' in Count III. These were eliminated in Instruction No. 11, 12, & 13[.] Were they supposed to be eliminated in Instruction No. 10?" The court discussed the question with the parties and, with the consent of both parties, the court sent a response to the jury that stated:

> Although "penis to genitals," "hand to genitals," and "penis to buttocks" are listed in the Indictment, those are not elements of the crime that the State is required to prove beyond a reasonable doubt. The State must prove sexual contact, or attempted sexual contact, as defined in Instruction No. 18, beyond a reasonable doubt. You must agree as to the

– 7 –

2727

specific conduct that has been proven beyond a reasonable doubt as described by Instruction No. 15.[6]

The jury ultimately convicted Riley of all three counts. A few days after the verdicts, Riley's attorney filed a motion for a new trial.[7] The attorney argued that Riley was prejudiced by the amendments to the jury instructions following closing arguments because he had specifically addressed, in his summation, the particular sexual conduct alleged. The attorney also argued that the last-minute change damaged his credibility in the eyes of the jury and could have influenced the verdict. The court summarily denied the motion.

This appeal followed.

*Riley's claims that the superior court erred in amending the jury instructions after the parties' closing arguments*

On appeal, Riley challenges both the substance and the timing of the superior court's amendment to the jury instructions for Counts I and II (the two attempt charges). With respect to the substance, Riley argues that the removal of the language resulted in a fatal variance from the indictment by allowing the jury to consider uncharged conduct as a basis for the attempt charges. With respect to the timing, Riley argues that the court violated Alaska Criminal Rule 30(a) by amending the instructions after closing arguments. Riley contends that he reasonably relied on the original

---

[6] Instruction No. 15 was a factual unanimity instruction, advising the jury that, "[w]here there is evidence of more than one act that could support a single count," the jury was required to "be unanimous as to the specific conduct that has been proven beyond a reasonable doubt." Instruction No. 18 defined "sexual contact."

[7] Alaska R. Crim. P. 33(a) (permitting the trial court to grant a new trial "if required in the interest of justice").

instructions when he gave his closing argument, and that the court's post-argument amendment to the instructions prejudiced his defense.

We have reviewed the record in this case, and we conclude that the change made to the jury instructions after closing arguments did not constitute a fatal variance — *i.e.*, a "departure in the proof from the indictment sufficiently great to be regarded as a constructive amendment" requiring automatic reversal.[8] The doctrine of fatal variance protects a defendant's right to a grand jury finding on every essential element of the offense.[9] Generally, "it is improper to convict a defendant based on evidence that is materially different from the evidence supporting the grand jury indictment."[10] But reasonable variations are permissible so long as the evidence is not materially different and involves the same basic criminal act or transaction that was considered by the grand jury in issuing the indictment.[11]

---

[8]   *Michael v. State*, 805 P.2d 371, 373 (Alaska 1991).

[9]   *Rogers v. State*, 232 P.3d 1226, 1240 (Alaska App. 2010) (noting that a trial jury can deviate from the view of events adopted by the grand jury so long as the State obtained a grand jury finding on every essential element of the offense).

[10]   *Taylor v. State*, 400 P.3d 130, 135 (Alaska App. 2017).

[11]   *See, e.g.*, *Harvey v. State*, 604 P.2d 586, 588-89 (Alaska 1979) (finding no fatal variance where the evidence before the grand jury suggested that the child died from a blow to the head and the trial evidence suggested other physical acts caused the death, as it was clear from the grand jury proceeding that the State would seek to show other acts caused the death and the difference in testimony "was not so great as to unfairly surprise" the defendant); *see also Taylor*, 400 P.3d at 136 (finding no fatal variance where the jury instruction on the felony eluding charge at trial included an additional theory of eluding (causing an accident), since the prosecutor had relied on the defendant's entire course of driving, including the defendant's reckless driving and his collision with a patrol car, at the grand jury proceeding).

Here, the charges of attempted second-degree sexual abuse of a minor presented to the grand jury and the trial jury involved the same essential elements: that (1) while Riley was 16 years of age or older, (2) he attempted to engage in sexual contact with C.S. (*i.e.*, he intended to engage in sexual contact with C.S. and he took a substantial step toward commission of the offense), and (3) C.S. was under 13 years of age.[12] "Sexual contact" is defined, in relevant part, as "knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast" or "knowingly causing the victim to touch, directly or through clothing, the defendant's . . . genitals, anus, or female breast[.]"[13] At each stage of the proceedings, the jury was required to find that Riley attempted to engage in "sexual contact" with C.S. in accordance with the statutory definition. And C.S. testified consistently between the grand jury proceeding and the trial about her encounter with Riley at the cabin.

As a result, Riley's convictions for attempted second-degree sexual abuse of a minor were not for offenses different from those originally charged by the grand jury.[14] We therefore reject Riley's argument that the change in the jury instructions constituted a fatal variance.

---

[12] AS 11.41.436(a)(2) & AS 11.31.100(a).

[13] AS 11.81.900(b)(61)(A).

[14] *Compare Michael v. State*, 805 P.2d 371, 374 (Alaska 1991) (finding a fatal variance between the indictment charging the defendant with assault for inflicting injuries on a child and the conviction for a lesser degree of assault based on trial evidence that the defendant failed to protect the child from attack by the mother); *Simpson v. State*, 705 P.2d 1328, 1331 (Alaska App. 1985) (finding a fatal variance where the record showed that two distinct criminal incidents had occurred and the defendant was convicted based on the uncharged incident), *with Bowers v. State*, 2 P.3d 1215, 1218 (Alaska 2000) (finding no fatal variance between the indictment charging the defendant with third-degree assault using a firearm and his conviction for assault using a rifle specifically, where the grand jury heard evidence of the defendant's use of both a rifle and a revolver).

However, we agree with Riley that amending the elements instructions after the parties argued the case to the jury violated Alaska Criminal Rule 30(a).

Under Criminal Rule 30(a), the trial court is required to inform the parties of "the final form of jury instructions prior to their arguments to the jury." The purpose of this rule is to alert the parties as to how the court will rule on their proposed instructions, so that the parties may best tailor their closing arguments to the evidence and the instructions.[15] Under this rule, the trial court retains discretion to "give the jury such instructions as it deems necessary at any stage of the trial" — such as supplemental instructions in response to a jury question, for instance, or curative instructions necessitated by improper arguments.[16] But Rule 30(a) establishes a presumption that,

---

[15] *See Rollins v. State*, 757 P.2d 601, 602 (Alaska App. 1988) ("Alaska Criminal Rule 30(a) provides that proposed instructions should be requested and ruled on prior to closing argument."); *see also United States v. Anderson*, 1 F.4th 1244, 1265 (11th Cir. 2021) (observing that the "overriding purpose" of the requirement in Federal Rule of Criminal Procedure 30 that a court inform the parties of the final jury instructions before arguments is "to alert counsel to the legal instruction that the court will give the jury so that counsel can best tailor her argument to the evidence and that instruction"); *United States v. Foppe*, 993 F.2d 1444, 1452 (9th Cir. 1993) (recognizing that the purpose of Federal Rule of Criminal Procedure 30 is "to inform the trial lawyers in a fair way what the instructions are going to be in order to allow counsel the opportunity to argue the case intelligently").

Similar to Alaska Criminal Rule 30, Federal Criminal Rule 30 requires a trial court to "inform the parties before closing arguments how it intends to rule on the requested instructions." Fed. R. Crim. P. 30(b). Both rules require a party to object to any perceived error in the instructions before the jury retires to deliberate. Fed. R. Crim. P. 30(d); Alaska R. Crim. P. 30(a).

[16] Alaska R. Crim. P. 30(a); *Des Jardins v. State*, 551 P.2d 181, 189 (Alaska 1976) ("[A]s a general rule, answering questions from the jury is within the trial judge's discretion."); *see also United States v. Tipton*, 90 F.3d 861, 886 (4th Cir. 1996) (observing that "[t]here is no question of the court's discretionary power to give post-argument instructions to remedy omissions in pre-argument instructions or to add instructions

(continued...)

absent a compelling reason, the jury instructions proposed by the parties and approved by the court in advance of closing arguments will not be changed after arguments.[17]

In this case, there was no compelling reason for the court to amend the jury instructions after closing argument. As a legal matter, the statute prohibiting sexual contact with a minor does not require the State to prove any particular *type* of sexual contact, so long as the conduct satisfies the statutory definition (and the jury unanimously agrees on the specific criminal act committed by the defendant). Accordingly, the State could have submitted jury instructions that contained only the bare statutory language. If it had done so, and Riley had then requested specifically

---

[16] (...continued) necessitated by the arguments," but as a general matter, the parties should know the instructions prior to closing arguments (internal quotations omitted)); *United States v. Pena*, 897 F.2d 1075, 1084-85 (11th Cir. 1990) (explaining that a post-argument change to the jury instructions will warrant reversal if the change was substantial, repudiated counsel's argument, or impaired the effectiveness of counsel's argument but cautioning that Federal Rule of Criminal Procedure 30 does not "empower counsel, through the mechanics of the closing argument, either to dictate the law by which a verdict is reached or to create a mistrial by erroneously stating the legal principles applicable to a given situation"), *abrogated on other grounds*, *Davis v. United States*, 512 U.S. 452 (1994).

[17] Courts must remain vigilant about the potential for prejudice that might result from a post-argument amendment to the instructions. *See Bowers*, 2 P.3d at 1221 (noting that the timing of the supplemental instruction, after arguments were completed and deliberations had commenced, "created a strong likelihood of prejudice"); *see also United States v. McCown*, 711 F.2d 1441, 1452 (9th Cir. 1983) ("The potential for prejudice is often great when the trial judge allows defense counsel to proceed with closing argument under the mistaken assumption that the jury will receive a certain instruction."); *People v. Clark*, 556 N.W.2d 820, 828-29 (Mich. 1996) (holding that, when the court modified a jury instruction on which defense counsel had substantially relied in his closing argument, "[t]he resulting prejudice could not effectively be cured through reargument" and a new trial was required, even where the modified instruction correctly stated the law and the original instruction did not).

tailored instructions prior to closing arguments, the trial court would have had broad discretion to decide whether to give them.[18]

But the State did not propose the bare statutory language. Rather, the State itself submitted a packet of jury instructions that, in addition to describing the elements of the attempt offenses, included the specific factual allegations from the indictment. The instructions were approved as drafted, and the State did not seek to amend them until *after* closing arguments. Riley was entitled to present his closing argument on the assumption that the instructions given to the jury would be the ones that the court had previously approved.[19] The court did not find that it would have been unjust to hold the State to the original instructions that it had proposed, nor would the court have committed error by maintaining the identifying language in the attempt instructions (indeed, Instruction No. 10 continued to contain the specific factual allegations from the indictment). We therefore conclude that the court erred in granting the State's untimely request to modify the instructions after closing arguments.

The Alaska Supreme Court's decision in *Bowers v. State* provides a close analogy to this case.[20] In *Bowers*, the defendant was indicted on one count of third-degree assault. The indictment charged that he had recklessly placed another person in

---

[18] *Phornasavanh v. State*, 481 P.3d 1145, 1154 (Alaska App. 2021) ("[A]s a general matter, as long as the jury is properly instructed on the law, a trial court 'has broad discretion to determine whether to give instructions specially tailored to the case at hand.'" (quoting *Young v. State*, 374 P.3d 395, 405 (Alaska 2016))).

[19] *See Rollins*, 757 P.2d at 602-03 (holding that the trial court erred in giving a supplemental instruction on a lesser included offense after closing arguments because the defendant was entitled, under Criminal Rule 30(a), to rely on the packet of instructions approved before closing arguments, from which the instruction at issue had been withdrawn).

[20] *Bowers v. State*, 2 P.3d 1215 (Alaska 2000).

fear of imminent physical injury "by means of a dangerous instrument, a firearm."[21]  The prosecutor presented evidence to the grand jury that the defendant had threatened his neighbor with both a rifle and a revolver, but the indictment did not specify which weapon formed the basis for the assault charge.[22]

At trial, in both opening statements and closing arguments, the prosecutor relied solely on the defendant's alleged use of the revolver to establish his criminal liability.[23]  During deliberations, however, the jury inquired whether the charge could also be based on the defendant's use of the rifle.  In response, the trial court issued a supplemental instruction informing the jury that it could find the defendant guilty based on his use of either weapon, so long as the jurors unanimously agreed on the conduct (*i.e.*, the particular weapon) forming the basis of the conviction.[24]

The supreme court rejected the defendant's claim that the supplemental instruction constructively amended the indictment.[25]  Noting that the grand jury heard evidence about the defendant's use of both weapons, the court concluded that the defendant was on notice that his use of either gun could form the basis for the third-degree assault charge.[26]

---

[21]  *Id.* at 1217.

[22]  *Id.* at 1216-18.

[23]  *Id.* at 1220-21.

[24]  *Id.* at 1217.

[25]  *Id.* at 1218-19.

[26]  *Id.* at 1218.

But the supreme court reached a different conclusion with respect to the propriety of the supplemental instruction.[27]  In particular, the court held that the timing of the supplemental instruction, in combination with the State's singular reliance at trial on the defendant's use of the revolver as the basis of liability, deprived the defendant of an opportunity to defend against a theory of guilt premised on the use of the rifle.[28]  Although the supreme court did not expressly rely on Criminal Rule 30(a) — presumably because the trial court was authorized to answer the jury's question[29] — the court concluded that the *content* of the supplemental instruction, issued after the close of evidence and after the jury had begun deliberating, was error, and that this error prejudiced Bowers's defense.[30]

Similarly, in Riley's case, the trial court's decision to modify the instructions after closing arguments did not constructively amend the indictment.  But Riley was entitled to rely in closing argument on the jury instructions submitted by the State and approved by the trial court, and it was error for the trial court to modify these instructions after argument and after the instructions had been read to the jury based solely on the State's oversight in limiting its theory of liability.

As in *Bowers*, the remaining question is whether this error resulted in actual prejudice to Riley's defense.[31]  When we consider the potential prejudice stemming from

---

[27]  *Id.* at 1219-21.

[28]  *Id.* at 1221.

[29]  *See Des Jardins v. State*, 551 P.2d 181, 189 (Alaska 1976).

[30]  *Bowers*, 2 P.3d at 1221.  The supreme court likened *Bowers* to this Court's decision in *Rollins v. State*, 757 P.2d 601 (Alaska App. 1988), which expressly relied on Criminal Rule 30(a).  *Bowers*, 2 P.3d at 1219-20 (discussing *Rollins*, 757 P.2d at 602).

[31]  *Bowers*, 2 P.3d at 1221; *see also People v. Clark*, 556 N.W.2d 820, 826 (Mich. 1996)

(continued...)

a change to the jury instructions after closing argument, we consider not only what the defense *did* argue, but also what the defense *could* have argued, had the final jury instructions been known.[32]  After closely reviewing the evidence presented at trial and the parties' closing arguments, we conclude that the amendment to the jury instructions was prejudicial as to Count I, but harmless as to Count II.

Count I, as described in the indictment and original jury instructions, charged Riley with attempted second-degree sexual abuse of a minor for attempting "penis to genitals" contact with C.S.  While Riley's primary defense was that he had no intent to engage in sexual contact at all, Riley's attorney used the specific phrase "penis to genitals" multiple times in his closing argument.  In particular, he asserted that Riley never admitted wanting "to put [his] penis to her genitals" and that C.S. never reported that Riley "tr[ied] to put his penis to [her] genitals."  The record therefore shows that Riley relied on the specific identifying language in the jury instructions when making his closing argument in defense of Count I.

---

[31]  (...continued)
("Our cases, as well as federal authority, indicate that where the trial court errs in misleading or misinforming counsel regarding the ultimate instructions that will be given to the jury and prejudice results, a new trial is required.").

[32]  *See Bowers*, 2 P.3d at 1221; *see also United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (explaining that "[a] party suffers prejudice if it was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments" (internal quotations omitted)); *Clark*, 556 N.W.2d at 826-27 (concluding that a change made to a jury instruction "at the eleventh hour" after closing arguments impaired the attorney's "ability to represent his client . . . with the result that the client's right to a fair hearing was prejudiced"); *Commonwealth v. Melvin*, 103 A.3d 1, 50-51 (Pa. Super. 2014) (holding that the defendant failed to establish prejudice where the defendant "offer[ed] no explication as to what the contents of [an alternate closing argument] would have included or what evidence could have been referenced in support thereof").

Given this reliance, the change in the instructions after argument may have seriously undermined the credibility of Riley's defense counsel.[33] Both parties told the jury to anticipate receiving jury instructions after their arguments. But while Riley's counsel repeatedly used the specific identifying language from the indictment in discussing Count I, the prosecutor used the more general term of "sexual contact." Then, after reading the instructions in their entirety to the jury, the court deleted references to the specific alleged acts in the elements instructions and specifically brought the change to the attention of the jury. The jury's question to the court during its deliberations signaled its awareness of and confusion over the change.[34]

Had Riley known the final form of the jury instructions, he might have presented his summation differently, placing less emphasis on allegations from the indictment. Notably, there was more than one act that could have formed the basis for Count I. Although it is clear that Count I related to the period of time when Riley and C.S. were alone on the couch downstairs, C.S. testified both that Riley had pulled her onto his lap while his genitals were exposed and that he had tried to put his hand down the back of her pants while she was lying on the couch.

The State was not consistent in its explanation of the theory of prosecution for this count. In her opening statement, the prosecutor suggested that the basis for Count I was Riley's attempt to reach down C.S.'s pants — he "comes up behind [C.S.],

---

[33] *Cf.* 5 Wayne R. LaFave et al., *Criminal Procedure* § 20.6(b), at 592 (4th ed. 2015) (noting that disclosure of late-discovered evidence can impact defense counsel's credibility when the "defense [has] already . . . committed itself in opening statements or in cross-examination to a line of attack that it would not have utilized if aware of the undisclosed [evidence]").

[34] *See Clark*, 556 N.W.2d at 827 (underscoring the jury's note seeking clarification regarding the changed jury instruction in concluding the defense had been prejudiced by the post-summation modification to the jury instruction).

puts his hands down her pants, tries to touch her genitals, [and] rubs his penis on her." (Riley's act of rubbing his penis on C.S. constituted the basis for Count III.) But in closing argument, the prosecutor asserted that Count I referred to Riley's act of "pulling [C.S.] onto his lap and attempting to engage in sexual contact."

Thus, although the State only charged Riley with one count of attempted sexual contact for his conduct on the couch, specifying "penis to genitals" in the indictment and initial instructions, the prosecutor's opening argument suggested an additional uncharged attempted "hands to genitals" contact on the couch. And because the State introduced evidence of more than one act that could have constituted the basis for Count I, a reasonable juror could have become confused when the identifying language, "penis to genitals," was deleted, leaving the jury without a guide for what conduct constituted the basis for Count I.

Moreover, removing the specific identifying language of "penis to genitals" from the elements instruction essentially allowed the jury to consider whether any of Riley's actions on the couch constituted attempted second-degree sexual assault. While the presence of a factual unanimity instruction ensured that the jurors agreed on which particular act formed the basis for Count I, amending the instructions after closing arguments denied Riley an opportunity to defend against this broader range of actions.

Thus, the combination of Riley's reliance in his closing argument on the specific identifying language, the evidence of multiple acts that could have constituted the crime of attempted second-degree sexual assault as charged in Count I, and the jury's confusion over the last-minute change to the instructions demonstrates that Riley was prejudiced as to Count I. For these reasons, we cannot say that the court's amendment to the jury instructions after closing arguments was harmless as to Count I.

But the circumstances surrounding Count II are distinguishable. Count II charged Riley with attempted second-degree sexual abuse of a minor for alleged "hand

to genitals" contact when Riley was in the bed with C.S. upstairs. In contrast to its presentation of Count I, the State made clear that it considered only one act to have formed the basis for Count II — Riley's act of rubbing C.S.'s leg and asking her where she wanted to be touched. The State's evidence and explanation of this charge were consistent throughout the trial.

Accordingly, there was no other alleged act that could have formed the basis for this charge and Riley's attorney did not need to rely on the specific identifying language in order to know what accusations to defend against. Indeed, although Riley's attorney mentioned this language in passing in his closing argument, he did not focus on it and instead argued generally that Riley had no intent to engage in sexual contact.

For these reasons, we conclude that the amendment to the jury instructions did not prejudice Riley's defense with respect to Count II.

*Riley's remaining claims on appeal*

Riley raises two additional arguments on appeal.

First, Riley contends that the superior court erred in instructing the jury — in response to its question during deliberations — that the State was not required to prove beyond a reasonable doubt the specific allegations of sexual contact in Instruction No. 10 (the indictment instruction). Because Riley did not object to the court's response to the jury's question, he must now show plain error.[35]

We find no plain error. The court correctly told the jury that only "sexual contact" and "attempted sexual contact" were elements of the respective charges and reminded the jury that it needed to be unanimous as to the specific conduct that the State

---

[35] *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) ("Plain error is an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial.").

had proven beyond a reasonable doubt. Given that the language identifying the specific *type* of sexual contact was not an element of the offense of attempted sexual abuse of a minor (indeed, the elements instruction for the completed offense did not include this language at all), we see no obvious error in the court's response to the jury's question.

Second, Riley argues that the superior court abused its discretion in denying his motion for a new trial. But Riley's motion was premised on the same claim of prejudice stemming from the court's amendment to the jury instructions. Since we have already addressed that claim, we need not address this issue further.

*Conclusion*

We REVERSE Riley's conviction for attempted second-degree sexual abuse of a minor as charged in Count I. We otherwise AFFIRM the judgment of the superior court.